**Odetta CLARY, Personal Representative of the Estate of Kevin Dale Clary and Parent and Natural Guardian of Kasey Dale Clary, a Minor, Appellant,**

v.

**Patrick H. DIBBLE and K & P Roofing Siding & Home Improvement, Inc., Appellees.**

No. 10A05–0811–CV–645.

Court of Appeals of Indiana.

April 9, 2009.

James E. Bourne, Forrest & Bourne, New Albany, IN, J. Anthony Goebel, Goebel Law Office, Georgetown, IN, Attorneys for Appellant.

Shannon L. Robinson, Kelley, Belcher & Brown, Bloomington, IN, Attorney for Appellee.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE

Odetta Clary, individually and as personal representative of the Estate of Kevin Dale Clary, and Kasey Dale Clary, a minor, by his mother and natural guardian, Odetta Clary (collectively, "Clary"), appeal the trial court's entry of summary judgment in favor of K & P Roofing Siding & Home Improvement, Inc. ("K & P").

We affirm.

### ISSUE

Whether the trial court erred in granting summary judgment to K & P.

### FACTS

In 2006, Patrick H. Dibble worked as a salesperson for K & P pursuant to a Commissioned Salesperson's Agreement (the "Agreement"), entered into on February 16, 2004, by Dibble and K & P. He used his own tools and drove his own vehicle, a Ford pick-up truck. He paid for his vehicle's insurance and did not receive travel-expenses reimbursement. It is undisputed by the parties that Dibble was considered to be an independent contractor.

On July 16, 2006, Shelter Distribution, Inc., a materials supplier for K & P, sponsored a golf tournament for several companies at the Covered Bridge Golf Club, located in Sellersburg. Since he had been invited to participate in the tournament, Dibble "felt obligated to go play[.]" (Clary's App. 78).

Dibble had taken a prescription pain reliever the morning of the golf tournament and had a hangover from drinking the previous night. Dibble arrived at the golf club at approximately 10:30 a.m., after doing some work for K & P. Before golfing, he ate a lunch provided by the sponsor.

Dibble played in a foursome along with Ron Cogburn, K & P's owner, James Reynolds, K & P's General Manager, and John Survance, a K & P salesperson. Dibble and Survance rode in one golf cart while Reynolds and Cogburn rode in another.

While playing, Dibble "was tired and felt a little bit nauseous, but for the most part tired." *Id.* at 79. He started falling asleep during the last nine holes and stayed in the golf cart. He had one beer after the 9th hole and drank water throughout the day. He informed the others in his foursome that he was tired.

Around the "12th hole or 13th hole," Reynolds noticed that Dibble's face was getting red and that he had blisters on the back of his neck. *Id.* at 43. Reynolds observed Dibble "resting in the cart," with a "rag around his neck and a rag on his face." *Id.* Dibble told Reynolds that he did not " 'feel good.' " *Id.* Reynolds thought that Dibble was "dehydrated" or "overheated." *Id.* at 43, 44. Cogburn "noticed him sweating and putting a cold rag on his head." *Id.* at 90. He also observed Dibble "[r]esting in the golf cart. . . ." *Id.* Cogburn believed that "the heat was tearing him up." *Id.*

When asked by the others in his group whether he wanted to quit, Dibble declined, asserting that he would be "'okay.'" *Id.* at 44. After the group finished golfing, they went to the clubhouse. Dibble told Reynolds that he was "'feeling a lot better.'" *Id.* Reynolds observed that Dibble "looked coherent" and "looked fine." *Id.* at 46. Dibble was drinking water and informed Reynolds that he was going to get something to eat. Cogburn did not see Dibble once they went back to the clubhouse. Dibble ate some dinner and "may have had a half beer when [he] ate[.]" *Id.* at 89.

Dibble left the golf club at approximately 6:30 p.m. and drove west on Perry Crossing Road in Clark County. At some point, he either fell asleep or blacked out, allowing his vehicle to cross the centerline. His vehicle struck a motorcycle on which Kevin and Kasey were riding, resulting in Kevin's death and injuries to Kasey.

Clary filed a complaint for damages against Dibble on September 25, 2006. On April 8, 2008, she filed an amended complaint. In Count I, she alleged that Dibble had negligently operated his vehicle. In Count II, she alleged that K & P was liable under the theory of respondeat superior. In Count III, she alleged, in part, as follows:

11. At all times relevant to this cause of action, [Dibble] worked as a sales representative for K & P and was either an agent, servant and employee, or a subcontractor, of K & P;

12. On July 18, 2006, by virtue of his business relationship with K & P, [Dibble] was obligated to and did play golf in a golf outing sponsored by Shelter Distribution, Inc., a material supplier of K & P, at Covered Bridge Golf Club in Clark County, Indiana;

13. At the golf outing Dibble rode in a golf cart with another sales representative of K & P, John Survance, and played in a foursome consisting of Dibble, Survance, Ron Cogburn, owner of K & P, and James Reynolds, Dibble's Sales Manager, all of whom were acting in the course and scope of their employment with K & P;

14. Because of the business relationship between Dibble and K & P, Cogburn and Reynolds had the right, ability and opportunity at all times relevant to this cause of action to control the actions of Dibble;

15. During the golf game, Dibble displayed symptoms of illness and fatigue so that his co-employees and superiors from K & P had actual knowledge that he was unfit to leave Covered Bridge Golf Club at the controls of a motor vehicle without endangering the lives and property of other motorists;

16. Cogburn and Reynolds are also charged with any superior knowledge Survance may have had of Dibble's condition;

17. After playing golf, Dibble left the golf club driving west on Perry Crossing Road in his Ford pickup truck and fell asleep or blacked out less than a mile from the golf club, causing the accident and Plaintiff's injuries and damages . . .;

18. Ron Cogburn and James Reynolds, acting in the course and scope of their employment with K & P, negligently failed to take action to prevent Dibble from driving his truck in his impaired condition, which negligence directly and proximately causing Plaintiff's injuries and damages[.]

*Id.* at 9–10.

On June 11, 2008, K & P filed its motion for summary judgment and memorandum in support thereof. Essentially, K & P argued that "Dibble's actions in this accident are not [its] responsibility" as Dibble

was an independent contractor and that "regardless of Dibble's employment status or the golf outing being a 'business event,' the incident occurred outside the scope of employment on Dibble's trip home." *Id.* at 23–24.

Clary filed a memorandum in opposition to K & P's motion for summary judgment on July 14, 2008. Therein, she stipulated that Dibble was "an independent contractor and not an employee of K & P." *Id.* at 58.

The trial court held a hearing on K & P's motion on August 18, 2008. On September 8, 2008, the trial court entered its order, stating as follows:

1. That the facts and circumstances designated create a genuine issue of material fact as to whether Defendant Dibble operated his vehicle in a negligent matter [sic].

2. That given the above, summary judgment as to Count I and its theory of Negligence is hereby DENIED.

3. That pursuant to stipulation of parties, Summary Judgment is GRANTED as to Count II of the First Amended Complaint as the theory of *Respondeat Superior* is inapplicable under the facts and circumstances in the instant matter.

4. That "[t]he doctrine of respondeat superior imposes liability on an employer for the wrongful acts of his employee committed within the scope of employment."

5. That "[t]he critical inquiry focuses on whether the employee is in the service of his employer when he commits the wrongful act."

6. That under Count III of the First Amended Complaint, the plaintiff alleges that Defendant Dibble by virtue of his

business relationship with Defendant [K & P] and by his activities at a golf outing sponsored by Shelter Distribution, Inc., acted within *"the course and scope of [his] employment with K & P."*

7. That the language of Count III of the First Amended Complaint essentially restates the theory of respondeat superior as a basis of Defendant [K & P's] liability in the instant matter.

8. That given the parties stipulation as to the inapplicability of said theory of liability there is no genuine issue of material fact, therefore, Defendant [K & P] is entitled to judgment as to Count III as a matter of law.

9. The [sic] given the above, the Court hereby GRANTS summary judgment as to Count III of the First Amended Complaint.

*Id.* at 4–5 (internal citations omitted).

## DECISION

Clary asserts that the trial court erred in granting K & P's motion for summary judgment. She raises several issues, one of which we find dispositive: whether "K & P owed [Clary] a duty not to allow ... Dibble to leave the golf course impaired." [1] Clary's Br. at 7.

■ When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Landmark Health Care Assocs., L.P. v. Bradbury,* 671 N.E.2d 113, 116 (Ind.1996). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue

---

1. Clary also asserts that the trial court erred in concluding that Count III of her complaint is identical to Count II and that if K & P did owe her a duty, there are genuine issues of material fact as to Dibble's physical condition prior to the accident.

**1038**

of material fact and the moving party deserves judgment as a matter of law. Ind. T.R. 56(C); *Blake v. Calumet Const. Corp.*, 674 N.E.2d 167, 169 (Ind.1996). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 318 (Ind.Ct.App.1991). All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party. *Tibbs v. Huber, Hunt & Nichols, Inc.*, 668 N.E.2d 248, 249 (Ind.1996). However, once the movant has carried his initial burden of going forward under Trial Rule 56(C), the nonmovant must come forward with sufficient evidence demonstrating the existence of genuine factual issues, which should be resolved at trial. *Otto v. Park Garden Assocs.*, 612 N.E.2d 135, 138 (Ind.Ct.App. 1993), *trans. denied.* If the nonmovant fails to meet his burden, and the law is with the movant, summary judgment should be granted. *Id.*

■ "Additionally, when material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts." *Mills v. Berrios*, 851 N.E.2d 1066, 1069 (Ind.Ct.App.2006) (quoting *Bennett v. CrownLife Ins. Co.*, 776 N.E.2d 1264, 1268 (Ind.Ct.App.2002)). We review a question of law de novo. *Id.* "Finally, if the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we will affirm." *Beck v. City of Evansville*, 842 N.E.2d 856, 860 (Ind.Ct.App.2006), *trans. denied.*

To recover on a theory of negligence, a plaintiff must establish three elements: (1) defendant's duty to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to that standard of care, and (3) an injury to the plaintiff proximately caused by the breach.

Whether the defendant must conform his conduct to a certain standard for the plaintiff's benefit is a question of law for the court to decide. Courts will generally find a duty where reasonable persons would recognize and agree that it exists. This analysis involves a balancing of three factors: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns.

*Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind.2003), *reh'g denied.*

*1. Relationship*

■ We initially look at the relationship between the parties in determining whether a duty existed. "A duty of reasonable care is 'not, of course, owed to the world at large,' but 'arises out relationship between the parties.'" *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind.Ct.App. 2004), *trans. denied.* Here, K & P had no relationship with Clary.

Clary, however, maintains that "K & P's relationship with *Dibble* was one in which K & P had 'sufficient influence and control' to prevent [him] from operating a motor vehicle in an impaired condition." Clary's Br. at 19 (emphasis added). She acknowledges that Dibble was not an employee of K & P but an independent contractor, and thus, concedes that K & P was not "liable for the negligence of Dibble." Clary's Reply Br. at 5. Rather, she argues that K & P was "responsible for its own negligence in failing to exercise the influence and control it had over Dibble." *Id.*

In support of her argument, she cites to *Gariup Constr. Co., Inc. v. Foster*, 519

N.E.2d 1224 (Ind.1988). The facts of *Gariup* are as follows:

> The case arose out of a Christmas party on December 17, 1982, a traditional event hosted by Gariup for employees and others on company premises. Gariup furnished food and refreshments, including alcoholic beverages. The Gariup office manager, Paul Orner, an employee for over fifteen months, attended the party and drank three or four beers between approximately 4:30 and 10:00 p.m. During the next 30–40 minutes, Orner consumed between six and eight shots of 80–proof whiskey while participating in a game of "Quarters" in which players would attempt to bounce a quarter off the table into a cup and, if successful, would designate another player to drink a shot of whiskey. He left the party at approximately 11:00 p.m. or later, intending to drive to pick up his wife from work approximately four miles away. The Orner residence was over ten miles from the Gariup premises. At about 11:40 p.m., Orner was observed driving eastbound on a 6–lane interstate highway, weaving through the eastbound lanes and median strip. He drove across the median into the oncoming lanes, continued driving eastbound in the westbound lanes, and struck Foster's vehicle head-on, resulting in serious spinal injury to Foster.

519 N.E.2d at 1226. Foster filed suit against both Orner and Gariup.

In determining whether Gariup owed Foster a duty, the Indiana Supreme Court

> view[ed] the issue not merely as a question of Gariup's duty to control Orner's conduct at the party, but rather as whether Gariup had a duty to exercise reasonable care such as to entitle the jury to determine whether Gariup was negligent under the circumstances in supervising the activities at the party, failing to stop or discourage the drinking game involving Orner, and continuing to furnish alcoholic beverages for Orner.

*Id.* at 1229. Among other things, our Supreme Court found it significant that Orner was an employee of Gariup and that it was "readily apparent that Gariup, as Orner's employer, had significantly greater influence and control over Orner than Gariup would have had over a non-employee, social guest." *Id.* Thus, "*[f]rom the facts and circumstances unique to* " Gariup, our Supreme Court held "that as between Gariup, Orner, and third-person motorists potentially exposed to significant danger in the event of Orner's drunk driving, there existed a relationship which as a matter of law gave rise to a duty on the part of Gariup to exercise ordinary and reasonable care." *Id.* (emphasis added).

█ Here, we cannot say that a relationship such as in *Gariup* existed between K & P, Dibble, and third-party motorists. Dibble was not an employee of K & P but an independent contractor, and therefore, not under K & P's influence and control as contemplated by *Gariup*. Also, the accident did not involve a vehicle of K & P; did not occur on K & P's property; and did not occur after an event sponsored, hosted, or required by K & P. *See Estate of Cummings by Heck v. PPG Industries, Inc.*, 651 N.E.2d 305, 311 (Ind.Ct.App. 1995) (finding that the employer-employee relationship did not give rise to a duty to control the employee's behavior during or after an event where the event was not held on the employer's premises; the employer did not organize the event; and the employer did not require its employees to attend the event), *trans. denied.*

More importantly, K & P did not in any way contribute to Dibble's impairment, where Dibble had been drinking on his own the night before the tournament and had taken a prescription medication prior

to the tournament. Thus, there was no influence and control as contemplated in *Gariup.* *See id.* (discussing the influence and control Gariup had over the activities that eventually led to Orner's inebriation); *see also Heck,* 786 N.E.2d at 268 (finding a "tenuous at best" relationship between an officer shot by a "drug-addicted felon fleeing from the police" and the felon's parents, who allowed their son access to the gun). Thus, this factor heavily weighs in K & P's favor.

### 2. *Foreseeability*

▮▮▮▮ Next, we examine whether the harm to the person injured was reasonably foreseeable. Clary argues that "[w]ith respect to the element of foreseeability, it is not difficult to envision that a person who was suffering all [of Dibble's] symptoms might fall asleep or black out while driving a motor vehicle." Clary's Br. at 19.

> Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. Thus, part of the inquiry into the existence of a duty is concerned with exactly the same factors as is the inquiry into proximate cause. Both seek to find what consequences of the challenged conduct should have been foreseen by the actor who engaged in it. We examine what forces and human conduct should have appeared likely to come on the scene, and we weigh the dangers likely to flow from the challenged conduct in light of these forces and conduct.

*Webb v. Jarvis,* 575 N.E.2d 992, 997 (Ind. 1991) (internal citations omitted), *reh'g denied.* "In other words, 'the foreseeability component of duty requires ... a general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.'" *Clark v. Aris, Inc.,* 890 N.E.2d 760, 764 (Ind.Ct.App.

2008) (quoting *Williams,* 809 N.E.2d at 477), *trans. denied.*

We disagree with Clary that it was foreseeable that a person, who had been feeling ill or tired during the day but was coherent and had not been observed drinking alcohol or taking drugs, would, after resting and proclaiming to feel better, later cause an automobile accident. Accordingly, we do not conclude that there was a high degree of foreseeability that failure to prevent such a person from driving would result in an accident.

### 3. *Public Policy*

▮▮▮▮ The final factor in determining whether a duty exists is public policy concerns. Regarding public policy concerns, " '[d]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of public policy which lead the law to say that the plaintiff is entitled to protection.'" *Williams,* 809 N.E.2d at 478 (quoting *Webb,* 575 N.E.2d at 997). "Various factors play into this policy consideration, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer." *Id.*

▮▮▮ We agree with Clary that "society has a legitimate interest in protecting its citizens by keeping seriously impaired drivers off the roadways." Clary's Br. at 19. However, it would be unreasonable to find it sound public policy to impose a duty on persons to determine the extent of their perceived influence and control over a person; surmise whether that person is too ill or tired to drive; and based on their conjecture, prevent that person from driving. "Ultimately, sound public policy dictates that the responsibility for negligent driving should fall on the driver." *Id.* at 479.

Upon balancing the three factors necessary in determining whether a duty exists,

we conclude that K & P did not owe a duty to Clary. We therefore find no error in granting K & P's motion for summary judgment.

Affirmed.

RILEY, J., and VAIDIK, J., concur.