# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**MICHAEL E. BROWN**
**JOHN B. DRUMMY**
Kightlinger & Gray, LLP
Indianapolis, Indiana

**CRYSTAL G. ROWE**
Kightlinger & Gray, LLP
New Albany, Indiana

ATTORNEYS FOR APPELLEES:

**THOMAS F. BEDSOLE**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

FILED

Jun 10 2013, 8:37 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FLAHERTY & COLLINS, INC., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1111-PL-569 |
| | ) | |
| BBR-VISION I, L.P., and NEW CASTLE | ) | |
| REALTY, LLC, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-0204-PL-715

June 10, 2013

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

Flaherty & Collins, Inc. ("F&C"), appeals the trial court's denial of its motion for partial summary judgment and the grant of a motion for partial summary judgment filed by the plaintiffs BBR-Vision I, L.P. ("BBR"), and New Castle Realty, LLC ("NCR").

We affirm in part, reverse in part, and remand for further proceedings.[1]

## ISSUES

I.     Whether the trial court erred as a matter of law in denying F&C's motion for partial summary judgment regarding the interpretation of an indemnification agreement;

II.    Whether the trial court erred in denying F&C's motion for partial summary judgment regarding BBR's claims under the Indiana Crime Victims Relief Statute ("Crime Victims Statute")[2]; and

III.   Whether the trial court erred in denying F&C's motion for partial summary judgment regarding F&C's claim that NCR was not a proper party to this action;

## FACTS AND PROCEDURAL HISTORY

BBR is a single-purpose entity formed by Theresa Bennett ("T. Bennett"), Dave Bennett ("D. Bennett"), and Duane Reindl ("Reindl") to develop and own a New Castle apartment complex known as Autumn Oaks. BBR designated sixty-eight of Autumn Oaks' seventy-two apartments as qualified low-income units, thereby qualifying the units for low-income tax credits pursuant to Section 42 of the Internal Revenue Code ("Section

---

[1] We thank counsel for their able presentations on oral argument in this matter.

[2] In its order denying F&C's motion for partial summary judgment, the trial court effectively granted summary judgment to BBR and NCR on this issue.

42"). The Indiana Housing Finance Authority ("IHFA") monitors compliance with Section 42.

In order to accomplish its goal of acquiring tax credits, BBR entered into a partnership agreement with NCR. Under the agreement, BBR received net cash flow from Autumn Oaks, as well as the tax credits. NCR, as a general partner of BBR, received a portion of the tax credits from BBR, and it was responsible for the transferal of the credits to investors for income tax purposes.

On June 30, 1999, F&C and BBR entered into a management agreement that required F&C to manage Autumn Oaks as an independent contractor. Section 5 of the management agreement provided that F&C would hire a particular number of "on-site" employees, including a manager, whose job descriptions and salaries would be in accordance with the management plan approved by BBR. Appellant's App. pp. 26-27. Section 6(d) of the management agreement provided that F&C would rent units to low-income households pursuant to the "Partnership Agreement"[3] and Section 42. *Id.* at 27. Section 6(d) also provided that F&C would obtain all income certifications required by Section 42, BBR, and regulatory agreements involving IHFA. Section 12 of the management agreement included similar reciprocal indemnification provisions pertaining to the actions of both F&C and BBR.[4]

---

[3] The "Partnership Agreement" is the agreement between BBR and NCR. As discussed in Issue 3, F&C signed the partnership agreement and the management agreement.

[4] Section 12(a) contains the indemnification provision outlining F&C's obligations. This provision is quoted in our discussion of Issue 1 below.

At some point, F&C hired Shannon Huse ("Huse") to be the Autumn Oaks site manager. As the site manager, Huse was required to ensure that Autumn Oaks' tenants met Section 42 household income requirements by, among other things, obtaining income-verification statements directly from the prospective tenant's employer and verifying the information contained therein.

In September of 2000, Huse rented Unit 216, a low-income unit, to the Johnsons. The income-verification statement faxed to Huse by Mr. Johnson's employer reported Mr. Johnson's hourly wage as $16.785, placing the Johnsons' annual income "well above the qualifying limit" under Section 42. *Id.* at 181. However, in 2001 F&C deduced that Huse had changed the income-verification statement to report Mr. Johnson's hourly wage as $10.785, placing the Johnsons' annual income within the qualifying limit under Section 42.

F&C also employed Kelly Higginbotham ("Higginbotham") as its compliance director. As the compliance director, Higginbotham was responsible for ensuring "that the households [units] that were going into the project were qualified at the income levels that were required" by Section 42. *Id.* at 108. She would ensure compliance by reviewing tenant applications and income-verification statements. *Id.* She would also review the tenants' annual recertification applications to ensure that the tenants continued to meet income and asset requirements set forth by the Internal Revenue Code, and she "processed all annual reporting information for the state," as required under the management agreement. *Id.* In preparing the annual report, Higginbotham would enter

4

data regarding the tenants' income and assets into a computer program maintained by IHFA. This data was necessary for annual re-certification of the tenants' eligibility.

In late September of 2001, Mr. Johnson's employer provided an annual recertification statement that listed his hourly wage as $17.73. On or about October 2, 2001, Higginbotham, who was reviewing Mr. Johnson's recertification materials, was surprised by the significant pay raise. Higginbotham instructed Holly Hudson ("Hudson"), Huse's replacement as onsite manager,[5] to contact Mr. Johnson's employer. The employer informed Hudson that Johnson's hourly wage in September of 2000 was $16.785, not $10.785. The employer had retained a copy of the September 2000 income-verification statement and faxed a copy to Hudson.

According to a timeline provided by Higginbotham to F&C executives and included as part of the designated evidence, Higginbotham contacted an IHFA representative on October 2, 2001, to ask for guidance concerning a hypothetical compliance problem. On the same day, Higginbotham wrote a note to F&C executives informing them of the compliance problem and of the IHFA's recommendation. Among other things, Higginbotham stated that the IHFA representative had recommended that F&C must move the Johnsons out of Unit 216 and move in qualified tenants. In addition, the representative had recommended that the parties "consult a qualified tax credit accountant and/or attorney" and make adjustments to their tax credit claims. *Id.* at 405.

---

[5] On June 21, 2001, F&C had terminated Huse because of attendance problems.

The timeline provides that on October 3, 2001, F&C's president, Jerry Collins ("Collins"), held a meeting with Higginbotham and F&C executives, including vice president Ray Hauser ("Hauser"). At a subsequent October 8, 2001 meeting, F&C executives directed Higginbotham to go to Autumn Oaks and review the original documents; which she did on the next day. Upon reviewing the documents, Higginbotham determined that Huse's change to the 2000 income-verification statement would have been undetectable without the information provided by the employer in late September, 2001.

Hudson and Higginbotham scheduled an October 15, 2001 meeting with the Johnsons. At that meeting, they informed the Johnsons about the compliance issue and told them that they must vacate Unit 216.

The timeline further provides that on November 5, 2001, Collins and Hauser met with BBR's representatives, D. Bennett and Reindl, and "notified them of the situation with the Johnson household." *Id.* at 386. After the meeting, BBR's representatives requested that Elizabeth Moreland Consulting ("Moreland Consulting") review the situation and provide an advisory letter to BBR. The concern of all parties at the time was that BBR and its members could lose tax credits if the Internal Revenue Service conducted an audit and demanded a recapture.

On or about December 20, 2001, Moreland Consulting sent a letter to Collins in which it outlined its "recommendations for correcting the noncompliance in [the Johnsons'] unit." *Id.* at 181. Moreland Consulting noted that it had recommended that

the Johnsons be notified that they could not remain in the unit; however, as of the date of the letter, the Johnsons had not vacated their unit. Moreland Consulting advised:

> Due to this noncompliance, Unit 216 should be considered "at risk" for the period of the Johnson's [sic] occupancy. Should this noncompliance be discovered during a monitoring review by the State Monitoring Agency, the noncompliance must be reported to the Internal Revenue Service (IRS) via Form 8823. State Monitoring Agencies are required to monitor each Housing Credit project once every three years. During these monitoring reviews, a minimum of 20% of the resident files must be reviewed and their corresponding units physically inspected. It is my understanding that [sic] Johnson household was not the original resident of Unit 216, so the noncompliance, if discovered, will not affect the original qualified basis of the building.

*Id.* at 182.

In January of 2002, Hudson discovered problems with the income-verification statements of three additional tenants. In a conversation with Reindl, Hudson informed him of three additional residents that did not meet the income requirements and that it appeared "that these residents' initial income verification forms as provided by their employers had been altered by [Huse] and that these residents appeared to have earned too much income at the time of their initial move-in to meet the income guidelines for [Autumn Oaks]." *Id.* at 207. Hudson also informed Reindl that Higginbotham had asked her to destroy the re-certification paperwork for these three residents; a claim that Higginbotham unequivocally denied in her deposition. Hudson informed Reindl that she had removed paperwork from a single file. Reindl instructed Hudson not to destroy or remove any more of the documents from the on-site files and requested that Hudson send copies of the available documents to him.

7

On or about January 30, 2002, BBR terminated F&C as its Autumn Oaks manager and replaced F&C with Valenti-Held Property Management, Inc. ("Valenti"). Valenti's contract became effective on February 15, 2002. In anticipation of new management, Reindl expressed his intention to retain F&C's current on-site staff under Valenti's supervision. Hudson, who continued her employment as on-site manager, complied with Reindl's request.

On April 19, 2002, BBR and NCR filed their complaint against F&C alleging (1) breach of contract; (2) negligent supervision; (3) indemnity; (4) fraud; and (5) civil recovery of treble damages by a crime victim pursuant to the Crime Victims Statute (Ind. Code § 34-24-3-1 (1998)).

On May 21, 2003, fearing possible recapture of the tax credits by the IRS that BBR had received from the Autumn Oaks units temporarily rented to non-qualifying individuals, NCR created an escrow account. NCR initially deposited $158,103.00 into the account and in 2004 increased the account balance to $185,614.00. The account, by its terms and due to the passage of time, has decreased every year, and the possible 2012 exposure balance had been reduced to $27,511.00. The evidence suggests that if the IRS has not instituted a tax audit by April 15, 2013, the remaining escrow balance shall remit to NCR.

On November 30, 2009, F&C filed a motion for partial summary judgment and memorandum in support thereof. In its motion and memorandum, F&C alleged that the management agreement's indemnification clause, as a matter of law, did not require F&C

8

to pay BBR's and NCR's attorney fees. F&C also alleged that BBR and NCR failed to allege facts to support their claim under the Crime Victims Statute. F&C further alleged that NCR should be dismissed from the lawsuit as a matter of law because it was not a party to the management agreement.

On August 20, 2010, BBR and NCR filed a motion for partial summary judgment and memorandum in support thereof. In the motion and memorandum, BBR and NCR argued, among other things, that there was no issue of material fact on the issue of fraud and that they were entitled as a matter of law to attorney fees under the management agreement's indemnification provision.

On October 3, 2011, the trial court issued separate orders denying F&C's motion and granting BBR and NCR's motion. In the order pertaining to F&C's motion, the trial court initially noted "that there are material issues of fact that preclude entry of partial summary judgment in favor of Defendant F&C." Appellant's App. p. 11. However, the trial court then found that "undisputed evidence" established that F&C's conduct violated the Crime Victims Statute. Specifically, the trial court found that the "undisputed evidence establishes that F&C's conduct violate[d] [forgery, counterfeiting, deception, and theft] statutes." *Id.* The trial court stated, "F&C's liability as to Plaintiffs' claims under the [Crime Victims Statute] is established." *Id.* at 12.[6] Essentially, the trial court

---

[6] The entry of specific findings and conclusions does not alter the nature of a summary judgment, which is a judgment entered when there are no genuine issues of material fact to be resolved. *State Auto. Ins. Co. v. DMY Realty Co., LLP,* 977 N.E.2d 411, 419 (Ind. Ct. App. 2012). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. *Id*. They merely aid our review by providing us with a statement of the trial court's actions. *Id*.

granted summary judgment for BBR and NCR on this issue. The trial court also found that NCR "had standing to assert its claims as a third-party beneficiary" to the management agreement. *Id.*

In the order pertaining to BBR and NCR's motion, the trial court determined that there were no material issues of fact on the breach of contract claim. The trial court determined as a matter of law that the indemnity clause language was "undisputed and unambiguous" and that it required F&C to pay BBR and NCR's attorney fees.

This Court accepted jurisdiction of the interlocutory appeal pursuant to Indiana Appellate Rule 14(B) on January 27, 2012.

Additional facts are disclosed in our discussion of the issues.

DISCUSSION AND DECISION

Summary judgment is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *City of Terre Haute v. Pairsh*, 883 N.E.2d 1203, 1206 (Ind. Ct. App. 2008), *trans. denied*. A genuine issue of material fact exists "'where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue.'" *Haub v. Eldridge*, 981 N.E.2d 96, 101 (Ind. Ct. App. 2012) (quoting *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 318 (Ind. Ct. App. 1991)). When reviewing entry of summary judgment, we stand in the shoes of the trial court. *Koppin v. Strode*, 761 N.E.2d 455, 460 (Ind. Ct. App. 2002), *trans. denied*.

10

The moving party bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Boston v. GYN, Ltd.*, 785 N.E.2d 1187, 1190 (Ind. Ct. App. 2003), *trans. denied*. We review only the designated evidentiary material in the record, construing that evidence liberally in favor of the nonmoving party so as not to deny that party its day in court. *Myers v. Irving Materials*, 780 N.E.2d 1226, 1228 (Ind. Ct. App. 2003). However, once the movant has carried its initial burden of going forward under Indiana Trial Rule 56(C), the nonmovant must come forward with sufficient evidence demonstrating the existence of genuine factual issues that should be resolved at trial. *Clary v. Dibble*, 903 N.E.2d 1032, 1038 (Ind. Ct. App. 2009), *trans. denied.* If the nonmovant fails to meet its burden, and the law is with the movant, summary judgment should be granted. *Id*.

Our standard of review is not altered by the fact that the parties filed cross-motions for summary judgment. *Sapp v. Flagstar Bank, FSB*, 956 N.E.2d 660, 663 (Ind. Ct. App. 2011). Instead, we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id*.

### 1. Indemnification Agreement

F&C contends that the trial court erred as a matter of law in interpreting the indemnification clause of the management agreement to require that F&C pay BBR's attorney fees arising from BBR's first-party action against F&C.[7] The general rule in Indiana is that each party to litigation must pay its own attorney fees. *Masonic Temple*

---

[7] F&C states that this appeal does not concern BBR's right to recover other expenses from the cleanup of the files altered by Huse. Appellant's Br. p. 24.

11

*Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins. Co.*, 837 N.E.2d 1032, 1037 (Ind. Ct. App. 2005). Attorney fees are not recoverable as damages in a breach of contract action in the absence of a statute, rule, or agreement to the contrary. *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1046 (Ind. Ct. App. 2012). We have held that if a defendant's breach of contract "causes a plaintiff to engage in litigation with a third party and such action would not have been necessary but for the breach, attorney fees and litigation expenses may be awarded as breach of contract damages." *Id.* This exception does not apply to BBR and NCR's first-party action.

The basis for BBR's claim is the indemnification agreement found in Section 12(a) of the management agreement. In this provision, which designates F&C as "Manager" and BBR as "Owner," F&C agreed as follows:

> Manager shall indemnify and defend Owner against and hold Owner harmless from any and all losses, costs, damages, liabilities and expenses, including, without limitation, loss or recapture of tax credits and reasonable [attorney] fees, arising directly or indirectly out of (i) any intentional or material breach by Manager of this Agreement (including, without limitation, failure to lease the residential units in compliance with this Agreement or Management Plan, the Partnership Agreement, the Regulatory Agreement, and Section 42 of the Code), (ii) any negligence, willful misconduct or illegal acts of Manager, or any of its officers, partners, directors, agents, or employees, in connection with this Agreement of Manager's services or work hereunder, whether within or beyond the scope of its duties or authority hereunder . . . .

Appellant's App. p. 30.

Our supreme court has held that "'indemnification clauses are strictly construed and the intent to indemnify must be stated in clear and unequivocal terms.'" *L.H.*, 974

N.E.2d at 1047 (quoting *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind. 1995)). Indemnity agreements are subject to the standard rules and principles of contract construction. *L.H.*, 974 N.E.2d at 1047. Interpretation of a written contract, including an indemnity provision, is a question of law. *Id*. We review questions of law de novo and owe no deference to the trial court's legal conclusions. *Koppin*, 761 N.E.2d at 460. Thus, we review de novo the trial court's conclusion that F&C was required to indemnify BBR.

The general legal understanding of indemnity clauses is that they cover "'the risk of harm sustained by *third persons* that might be caused by either the indemnitor or the indemnitee. It shifts the financial burden for the ultimate payment of damages from the indemnitee to the indemnitor.'" *L.H.* at 1047 (quoting *Indianapolis City Market Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1023 (Ind. Ct. App. 2009)). As we noted in *L.H.*, other authorities recognize this general understanding. 974 N.E.2d at 1047-48 (citing Am. Jur. 2d 415, Indemnity § 1 (2005) ("In general, indemnity is a form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party"); C.J.S 94, Indemnity § 1 (2007) ("In a contract of indemnity, the indemnitor, for a consideration, promises to indemnify and save harmless indemnitee against liability of indemnitee to a third person or against loss resulting from such liability")).

There is no absolute prohibition against one party agreeing to indemnify the other party for first-party claims arising between those parties. *Id*. at 1048. Where the plain

13

language of the provision requires first-party indemnification, then such indemnification is permitted. *Sequa Coatings Corp. v. N. Ind. Commuter Transp. Dist.*, 796 N.E.2d 1216, 1229 (Ind. Ct. App. 2003) (noting that "the plain language" expressly stated, among other things, "'any and all Causes of Action, as defined above, asserted by any parties and non-parties to this Agreement'"), *trans. denied*.

BBR asserts that there is "plain language" in Section 12(a) of the management agreement that supports its claim for attorney fees. Appellees' Br. p. 20. Specifically, it points to language that provides F&C "shall indemnify and defend Owner against and hold Owner harmless from any and all losses, costs, damages, liabilities and expenses, including, *without limitation*, loss or recapture of tax credits and reasonable [attorney] fees, *arising directly or indirectly out of [breach of contract]. . . .*" Appellant's App. p. 30 (emphasis added). The "without limitation" and "arising directly or indirectly out of [breach of contract]" language appears to be an attempt to ensure that all types of third-party damages be paid by F&C upon its breach of the management agreement. The agreement does not state the intent to indemnify against first-party actions in clear and unequivocal terms. Indeed, the agreement does not explicitly or implicitly refer to such actions. In short, the language of Section 12(a) of the management agreement does not create an exception to the general rule that an indemnity clause creates liability to pay only for third-party actions. Therefore, the trial court erred as a matter of law in

14

interpreting Section 12(a) of the management agreement to require F&C to pay attorney fees for first-party actions.[8]

## 2. Crime Victims Statute

F&C contends that the trial court erred in denying its summary judgment motion, and in doing so, effectively granted summary judgment to BBR and NCR on their claim for punitive relief under the Crime Victims Statute. The trial court found that "the undisputed evidence establishes that F&C's conduct violate[d] Ind. Code § 35-43-5-2 (forgery and counterfeiting); I.C. 35-43-5-3(a) (deception); and I.C. 35-43-4-2 (theft)." Appellant's App. p. 11. The trial court further found that "[t]he undisputed evidence establishes that Plaintiffs are entitled to recover damages pursuant to [the Crime Victims Statute] for any pecuniary losses suffered by Plaintiffs as a result of F&C's violations . . . the Court orders that F&C's liability as to Plaintiffs' claims under the [Crime Victims Statute] is established." *Id.* at 12.

The Crime Victims Statute is punitive in nature and must be strictly construed. *NationsCredit Commercial Corp. v. Grauel Enters., Inc.*, 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998), *trans. denied*. As such, the statute cannot be enlarged by construction, implication, or intendment beyond the fair meaning of the language used. *Herron v.*

---

[8] Our opinion should not be read to divest BBR and NCR of the right to recover reasonable damages resulting from F&C's breach of the management agreement, including those attorney fees, if any, necessarily incurred in an advisory capacity to ensure BBR and NCR's compliance with applicable tax laws. Of course, the trier of fact must exercise its duty to determine the nexus between actual harm and mitigation before arriving at the amount of damages, if any, due to BBR and NCR. In short, there is an evidentiary dispute that must be resolved after a trial on the merits.

15

*State*, 729 N.E.2d 1008, 1010 (Ind. Ct. App. 2012), *trans. denied.* In order to establish a viable civil claim for damages under the statute, a plaintiff must show a violation of at least one of the code sections listed in the statute and must demonstrate that the violation caused the loss suffered by the plaintiff. *McLemore v. McLemore*, 827 N.E.2d 1135, 1144 (Ind. Ct. App. 2005). The mens rea requirement of the underlying criminal actions differentiates those acts from the more innocent breach of contract that the criminal statutes were not intended to reach. *NationsCredit*, 703 N.E.2d at 1078.

Indiana Code section 35-43-5-2(a) (1977) states that a person commits the Class D felony of counterfeiting if a person knowingly or intentionally makes[9] or utters[10] a written instrument in such a manner that it purports to have been made by another person, at another time, with different provisions, or by someone who did not give authority. The crime is elevated to forgery, a Class C felony, if it is made "with intent to defraud." I.C. § 35-43-5-2(b). "Intent to defraud" involves "intent to deceive and thereby work a reliance and an injury." *Williams v. State*, 892 N.E.2d 666, 671 (Ind. Ct. App. 2008), *trans. denied.* There must be a potential benefit to the maker or a potential injury to the defrauded party. *Jacobs v. State*, 640 N.E.2d 61, 65 (Ind. Ct. App. 1994), *trans. denied.*

In addition, Indiana Code section 35-43-5-3(a) (1996) states that a person commits deception, a Class A misdemeanor, when he or she (1) knowingly or intentionally makes

---

[9] The term "make" means to "draw, prepare, complete, counterfeit, copy, or otherwise reproduce or alter any written instrument in whole or in part." Ind. Code § 35-43-5-1(m) (1995).

[10] The term "utter" means "to issue, authenticate, transfer, publish, deliver, sell, transmit, present, or use." Ind. Code § 35-31.5-2-345 (2012) (formerly codified at Ind. Code §35-41-1-27).

a false or misleading written statement with intent to obtain property, and/or (2) misapplies entrusted property in a manner that the person knows is unlawful or that the person knows involves substantial risk of loss or detriment to either the owner of the property or to a person for whose benefit the property was entrusted. Further, a person commits theft, as Class D felony, when he or she "knowingly or intentionally exerts unauthorized control over the property of another person with intent to deprive the other person of any part of its value or use." Ind. Code § 35-43-4-2 (1985).

F&C admits that it believes[11] Huse altered the financial documentation received from Johnson's employer to make it appear that Johnson qualified for low income housing in Unit #216 so that BBR was entitled to tax credits under Section 42. F&C argues, however, that it is not liable for Huse's actions because they occurred outside the scope of her employment.

A business entity may be held liable for an employee's criminal acts "as long as the employee was acting within the scope of employment." *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 654 (Ind. Ct. App. 2008). The entity may be held liable if the employee's "'purpose, was to an appreciable extent, to further [her] employer's business, even if the act was predominantly motivated by an intention to benefit the employee [herself].'" *Id*. at 655 (quoting *Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 105 (Ind. 1997)). Even if a particular act was not authorized by the

---

[11] F&C's admission is based upon its deductions from the circumstances, and it is sufficient for purposes of this civil action. Neither Huse's guilt nor innocence has been established by law enforcement or any state or federal agency.

17

corporation, "'[i]f there is sufficient association between the authorized acts and the unauthorized acts, the unauthorized acts may fall within the scope of employment.'" *Id.* (quoting *Hurlow v. Managing Partners, Inc.*, 755 N.E.2d 1158, 1162 (Ind. Ct. App. 2001), *trans. denied*).

Here, it is undisputed that Huse received the report from Johnson's employer as part of her duties as an F&C employee and that she "verified" the contents of the report as part of those same duties. Unfortunately for F&C, Huse's "verification" apparently included the changing of critical information on the report. Under the reasoning of *Prime Mortgage* and similar cases, we cannot but conclude that Huse's unauthorized acts occurred within the scope of her employment. Accordingly, F&C is liable for her acts under the doctrine of respondeat superior.

However, our consideration does not end here. BBR and NCR's claim is an attempt to recover pecuniary losses caused by Huse's admitted acts. The evidence is disputed, however, as to whether Huse's acts caused any harm to BBR and NCR. There is designated evidence to indicate that F&C discovered the changes to the documentation on or about October 2, 2001, and, after conducting an investigation, it informed BBR owners D. Bennett and Reindl on November 5, 2001, that there was a problem with Johnson's unit that could put BBR's eligibility for tax credits for Unit #216 in jeopardy. Even if we accept BBR and NCR's claim that they did not know of the change to the paperwork made by Huse, we must conclude that there is a genuine issue of material fact as to whether BBR and NCR learned enough in the November 5, 2001 meeting to allow

18

them to work with F&C to remedy any problem caused by Huse's actions. In short, there is a genuine issue of material fact regarding whether it was Huse's action or BBR and NCR's inaction that caused any pecuniary loss to BBR and NCR. Therefore, the trial court erred in making findings that effectively granted summary judgment to BBR and NCR on the issue of whether they could recover damages under the Crime Victims Statute that were attributable to Huse's falsification of Johnson's or any other residents' certification documents.

The trial court also found that F&C committed deception. This deception occurred during the period after F&C's discovery of the falsified document and before BBR and NCR terminated the management agreement. We have examined the designated evidence and have found genuine issues of material fact pertaining to whether F&C committed deception as part of a cover-up following its discovery of the falsified document or whether F&C properly kept BBR and NCR apprised of essential information as it conducted a legitimate investigation into Autumn Oaks' files.[12] As our supreme court held in *Klinker v. First Merchs. Bank, N.A.*, 964 N.E.2d 190, 195 (Ind. 2012), finding mens rea in the absence of a confession "invariably requires weighing evidence, judging witness credibility, and drawing reasonable inferences from that facts, all of which are improper in considering a motion for summary judgment." Accordingly, the trial court erred in effectively granting summary judgment to BBR and NCR on the issue

---

[12] On appeal, BBR and NCR make no separate argument pertaining to its theft claim. We note that a breach of contract is not a theft, and there is no designated evidence that supports the theft claim.

of whether F&C committed deception in a cover-up of verification problems at Autumn Oaks.[13]

BBR and NCR argue that spoliation of evidence occurred when Hudson, allegedly at Higginbotham's request, removed paperwork from one of Autumn Oaks' tenant's files. F&C argues, and we agree, that there is a genuine issue of fact regarding this destruction and its possible pecuniary effect upon BBR and NCR.

At best, spoliation of evidence permits a jury to "infer that the missing evidence [is] unfavorable" to the party who intentionally destroyed evidence. *Glotzbach v. Froman*, 854 N.E.2d 337, 338 (Ind. 2006). The inference does not relieve BBR and NCR of proving their case. *See Alsheik v. Guerrero*, 956 N.E.2d 1115, 1124 (Ind. Ct. App. 2011), *aff'd in pertinent part by Alsheik v. Guerrero*, 979 N.E.2d 151 (Ind. 2012).

### 3. NCR's Status

F&C contends that the trial court erred as a matter of law in denying its motion for partial summary judgment as it applied to NCR's standing in this action. The trial court determined that NCR "has standing to assert its claims as a third-party beneficiary of the Management Agreement." Appellant's App. p. 12.

Generally, only those who are parties to a contract, or those in privity with a party, have the right to recover under a contract. *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 275 (Ind. Ct. App. 2001). However, an entity that is not a party to the

---

[13] F&C also contends that the trial court erred in granting summary judgment to BBR and NCR on their common law fraud claim. The fraud claim, standing alone, is insufficient to activate the provisions of the Crime Victims Statute. However, the claim is intertwined with BBR and NCR's other claims under the Crime Victims Statute, and there are genuine issues of material fact which require reversal.

contract may enforce the provisions of the contract by demonstrating that it is a third-party beneficiary thereto. *Id*. "A third-party beneficiary contract is one in which the promisor has a legal interest in performance in favor of the third party and in which the performance of the terms of the contract between two parties must necessarily result in a direct benefit to a third party which was so intended by the parties." *Id*. A third party must show that it will derive more than an incidental benefit from the performance of the promisor. *Id*. at 275-76.

In order to enforce a contract by virtue of being a third-party beneficiary, an entity must show (1) a clear intent by the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract. *Id*. at 276. Among these three factors, the intent of the contracting parties to benefit the third-party is controlling. *Id*.

Our review of the record on appeal discloses that NCR is the general partner of BBR. Pursuant to the partnership agreement between NCR, BBR, and its investors, NCR guaranteed that Autumn Oaks will be operated in compliance with all applicable laws and that the anticipated Section 42 tax credits will be received in the years anticipated. Appellant's App. pp. 212-306. Pursuant to the partnership agreement, NCR receives 90 percent of the net cash flow generated from Autumn Oaks and is entitled to .01 percent of the tax credits received by BBR for Autumn Oaks. F&C signed the partnership agreement as "a consenting party with respect to the provisions of section 8.15." *Id.* at

306. Section 8.15 of the partnership agreement provides that "the Partnership," which includes NCR, shall select the management company for Autumn Oaks. *Id.* at 279.

The management agreement states that the parties thereto are F&C and BBR. However, the agreement also provides that F&C will rent Autumn Oaks' units "in accordance with the requirements of the Partnership Agreement and [Section 42] . . . ." *Id.* at 27. Further, BBR signed the management agreement "By: [NCR]" and members. *Id.* at 37.

The partnership and management agreements establish that the parties clearly intended to benefit NCR and that the duty imposed on F&C was in favor of NCR. Indeed, NCR's receipt of monies and tax benefits depended on F&C's performance of its responsibilities under the partnership and management agreements. The trial court was correct as a matter of law in determining that NCR has standing as a third-party beneficiary to assert its claims in this action.

## CONCLUSION

The trial court erred as a matter of law in determining that Section 12(a) of the management agreement permits BBR and NCR to recover attorney fees. The trial court further erred in effectively granting summary judgment to BBR and NCR on their Crime Victims Statute claim and on the issue of whether F&C committed deception. As a matter of law, the trial court properly denied F&C's summary judgment claim that NCR is not a party to this action.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J., and BROWN, J., concur.