FILED

05/15/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 21, 2017 Session

## INDIVIDUAL HEALTHCARE SPECIALISTS, INC. v. BLUECROSS BLUESHIELD OF TENNESSEE, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 111042III      Ellen H. Lyle, Chancellor**

_____

### No. M2015-02524-COA-R3-CV

_____

This is a breach of contract action in which the issues hinge on the meaning of several provisions in the agreement. In 1999 and again in 2009, BlueCross BlueShield of Tennessee, Inc. ("BlueCross") and Individual Healthcare Specialists, Inc. ("IHS") entered into a general agency agreement that authorized IHS to solicit applications for individual insurance policies through IHS's in-house agents and outside "subagents." The commission rates to be paid were stated in a schedule, which was subject to modification by BlueCross. During the first eleven years, BlueCross modified the commission schedule several times and each modification was prospective only. In 2011, BlueCross modified the commission schedule and, for the first time, applied the commission schedule retrospectively. At the same time, IHS determined that BlueCross had been underpaying commissions since 1999. As a consequence, it commenced this action asserting claims for, *inter alia*, breach of contract and damages, while also claiming it was entitled to recover its attorney's fees based on the contract's indemnification provision. BlueCross denied any breach of contract. It also asserted the statute of limitations defense as a bar to recovering any commissions that accrued more than six years earlier, and asserted that IHS was not entitled to recover its attorney's fees because the indemnification provision did not apply to disputes between the contracting parties. Shortly thereafter, BlueCross terminated the general agency agreement and began paying renewal commissions directly to IHS's subagents instead of paying them to IHS as it had done since 1999. IHS then amended its complaint to assert a claim that BlueCross also breached the agreement by failing to pay commissions directly to IHS. Following a bench trial, the court denied BlueCross's statute of limitations defense on the ground that IHS's claims were "inherently undiscoverable." The court also determined that BlueCross breached the contract by underpaying commissions, by applying the 2011 commission rates for renewals to existing policies, and by failing to pay all renewal commissions to IHS after termination of the general agency agreement. As for damages, the court awarded IHS some of the damages it claimed but denied others on the ground the evidence was speculative. As for IHS's attorney's fees, the trial court considered parol

evidence to ascertain the intent of the parties and held that the indemnification provision authorized the recovery of attorney's fees in a dispute between the contracting parties. Accordingly, it held that IHS, as the prevailing party, was entitled to recover its attorney's fees. Both parties appeal. We affirm the trial court in all respects but one, that being the award of attorney's fees. We have determined the trial court erred by considering parol evidence to determine the meaning of the indemnification provision. We also find that the indemnification provision does not apply to contractual disputes between the parties. Accordingly, IHS is not entitled to recover its attorney's fees in this action.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

E. Todd Presnell, Joel D. Eckert, Edmund S. Sauer, and Junaid A. Odubeko, Nashville, Tennessee, for the appellant, BlueCross BlueShield of Tennessee, Inc.

Jay S. Bowen and Will Parsons, Nashville, Tennessee, for the appellee, Individual Healthcare Specialists, Inc.

**OPINION**

In 1999, BlueCross and IHS negotiated and executed a General Agency Agreement ("the 1999 agreement"). This agreement authorized IHS to solicit applications for BlueCross's individual hospital, surgical, medical, and supplemental insurance policies through a network of in-house agents and outside brokers, known as "subagents" or "producing agents." In 2009, BlueCross and IHS renewed their contractual relationship by executing a second agency agreement ("the 2009 agreement") that was substantially similar to the 1999 agreement.

Pursuant to each of the agreements, BlueCross agreed to compensate IHS and its subagents by paying a commission on sales. BlueCross paid two types of commissions: first year commissions, based on premiums paid in the insurance policy's first year; and renewal commissions, based on renewal premiums paid in subsequent years. Attached to, and incorporated by reference within, the 1999 agreement was a "Commission Schedule," which set the specific commission rates for first year and renewal commissions for each of BlueCross's insurance products. The commission schedule expressly provided that it "shall be subject to change by BlueCross," and BlueCross exercised its right to modify the commission schedule under the 1999 agreement on

several occasions.[1] Each modified commission schedule contained the following language:

> 3. This Commission Schedule supplements any previous Commission Schedule you may have received; **commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made.**
>
> . . .
>
> [BlueCross] reserve[s] the right to modify or change the commission and payment schedules with appropriate notification.

(Emphasis added).

When the parties entered into their 2009 agreement, they continued to provide for compensation pursuant to a commission schedule which was attached to the contract and incorporated by reference therein. As before, and in pertinent part, the commission schedule included within the 2009 agreement provided that it "supplements any previous Commission Schedule . . . ," and that "commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made." The 2009 commission schedule also reserved BlueCross's right to modify or change the commission and payment schedules with appropriate notice.

Further, the 2009 agreement provided that BlueCross would pay all commissions, whether for policies sold by IHS's in-house agents or its subagents, directly to IHS. With respect to policies sold by subagents, IHS would retain a portion of the commission and remit the remainder to the subagent. The agreement stated that "in the event [IHS] is no longer able, entitled or available to receive Commissions, [BlueCross] shall use its best efforts to contract individually with the [subagents] . . . ."

The 2009 agreement also authorized either party to cancel the agreement "at any time and for any reason . . . upon ninety (90) days prior written notice." Upon termination,

> Neither party and no Producing Agent shall have any claim against the other for any alleged loss of prospective profits or commissions . . . , with

---

[1] The record indicates that BlueCross modified the commission schedule under the 1999 agreement on the following occasions: April 2004, June 2005, October 2005, January 2006, December 2006, June 2008, and November 2008.

the exception that renewal commissions for policies with effective dates prior to termination will continue to be paid by [BlueCross].

Further, the agreement contained an indemnity provision requiring BlueCross to,

> indemnify and hold [IHS], as well as its Directors, Officers, and employees, harmless from any and all claims, lawsuits, settlements, judgments, costs, interest, and penalties, expenses and taxes, including but not limited to attorney's fees and court costs, resulting from or arising directly or indirectly out of or in connection[] with, any action or lack of action by [BlueCross] associated with this agreement.[2]

The 2009 agreement also contained an integration clause which provided as follows:

> This Agreement, together with any attached amendments, exhibits and supplements and all referenced schedules and plans constitute the entire Agreement between the parties hereto, provided, however, that anything not specifically set forth herein will be subject to the rules and regulations of the Company as such are issued from time to time. Any prior agreements, promises, negotiations or representations, either verbal or written relating to the subject matter of this agreement and not expressly set forth in this Agreement are of no force or effect. No amendments shall be effective unless in writing and signed by authorized representatives of both parties hereto.

In February 2010, BlueCross exercised its right to modify the commission schedule listed in the 2009 agreement. Like each prior commission schedule modification, the 2010 commission schedule stated that "commissions for products previously sold are governed by the Commission Schedule at the time the sale was made." Additionally, the new schedule restated BlueCross's right to "modify or change the commission and payment schedules with appropriate notification."

In May 2011, BlueCross again promulgated a new commission schedule ("the May 2011 commission schedule"). The May 2011 commission schedule stated,

1. **This Commission Schedule replaces any previous Commission Schedule you may have received.**

. . . .

---

[2] The agreement contained a reciprocal indemnity provision applying to IHS.

5. We reserve the right to modify or change the commission and payment schedules with appropriate notification. Failure to receive this notice will not change its effective date.

(Emphasis added). As can be seen from this language, the May 2011 commission schedule not only changed the commission rate for future policies, but purported to change the rate for renewals of *existing* insurance policies.

At about the same time in 2011, BlueCross and IHS discussed the possibility of BlueCross purchasing IHS based on a yet to be determined multiple of IHS's projected annual commission revenue. These discussions prompted James Walker, President of IHS, to project IHS's annual revenue. In the process of designing a computer model to project the revenue, Mr. Walker began to suspect that IHS was being underpaid by BlueCross. After an internal analysis of its records, Mr. Walker concluded that BlueCross had been underpaying commissions owed to IHS since 1999.

For these reasons, IHS filed this action against BlueCross on July 29, 2011, asserting that BlueCross breached their contract by underpaying commissions and by retroactively reducing its commission schedule. The complaint also asserted claims for unjust enrichment and conversion, and requested an accounting to determine the precise amount of commissions that should have been paid. Further, IHS asserted a claim for attorney's fees pursuant to the indemnity provision in the 2009 agreement, which it claimed applied to disputes between BlueCross and IHS.

In November 2011, BlueCross advised IHS that it was terminating the 2009 agreement and that, effective February 23, 2012, it would no longer pay commissions on policies sold by IHS's subagents to IHS, but would pay these commissions directly to the subagents. Thereafter, IHS filed an amended complaint to include an allegation that BlueCross had breached the contract by paying commissions directly to IHS's subagents after terminating the agreement.

Shortly thereafter, IHS moved for partial summary judgment on its breach of contract and indemnity claims. BlueCross opposed the motion. The trial court ruled that there were "no ambiguities in the parties' contract documents" and that IHS's claims involved pure questions of contract, but IHS's interpretation of the contract did not prevail as a matter of law. Therefore, IHS's motion for summary judgment was denied.

BlueCross subsequently filed a motion for partial summary judgment on IHS's claims contending it was entitled to partial summary judgment on three grounds. It contended the court should summarily dismiss each of the claims asserted by IHS. Further, it contended the statute of limitations barred any breach of contract claims accruing prior to July 29, 2005, and its unjust enrichment and conversion claims accruing

prior to July 29, 2008. BlueCross also contended it did not breach the agreements; therefore, IHS was not entitled to damages.

In its response to the motion, IHS submitted parol evidence to support its interpretation of the agreement. In pertinent part, IHS submitted sworn declarations from three former BlueCross employees who expressed their general understanding that the 1999 agreement would prohibit BlueCross from applying new commission rates to existing policies and would require indemnification for attorney's fees in contractual disputes between IHS and BlueCross.[3]

After hearing arguments from the parties, the trial court denied BlueCross's motion. The trial court restated its finding that the 2009 agreement was unambiguous; nevertheless, it relied on the declarations of the witnesses to the 1999 agreement to find a mutual intent by IHS and BlueCross for the indemnification provision in the 1999 agreement, and, by extension the 2009 agreement, to serve as a prevailing-party attorney's fees provision. Additionally, the court determined that the declarations showed that the parties intended that the modification of commission schedules would only be done prospectively. The trial court justified its consideration of extrinsic evidence when interpreting the unambiguous contract by relying on the California Supreme Court's opinion in *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 442 P.2d 641 (Cal. 1968), which allows California courts to go beyond the four corners of written contracts to divine the parties' intentions. *Id.* Additionally, the trial court determined that material questions of fact existed with regard to BlueCross's statute of limitations defense and, therefore, also denied the motion as to that issue.

The pertinent part of the trial court's ruling on BlueCross' motion for summary judgment reads:

> In its 2013 Memoranda and Orders [ruling on IHS's motion for summary judgment], the Court held that the . . . claims [related to (1) the indemnity provision; (2) retroactive reduction of renewal commissions; and (3) direct payment of sub-agents] presented pure questions of contract interpretation, there were no ambiguities, and that the Plaintiffs interpretations did not prevail as a matter of law. Now using these prior rulings, the Defendant asserts that summary judgment should be entered in its favor dismissing the claims.

---

[3] The testimony of the former BlueCross witnesses was limited to their understanding of the 1999 agreement because they were not employed by BlueCross in 2009 and they were not involved in negotiating the 2009 agreement.

In opposition, the Plaintiff has provided the Court declarations of three former employees of Defendant. The employees were intimately involved with the negotiation and drafting of the General Agency agreements and addenda, whose construction is at issue here on summary judgment.

The declarations of Defendant's former employees explain the concerns and motivations surrounding the contract provisions on which the Defendant seeks summary judgment. Significant is that the declarations are admissions of the Defendant as the declarations are from Defendant's former employees who were charged with authority for the Defendant on negotiating and implementing these contract provisions.

The declarations of Defendant's former employees assert that the interpretations placed on the contract provisions in issue by the Plaintiff were the interpretation mutually intended and meant to apply by the Defendant at the time the contract provisions were entered into by the parties.

At the time the Court concluded in 2013 that the contract provisions in issue were unambiguous, the declarations of these individuals had not been filed. The Court did not have these admissions showing that the Defendant shared the Plaintiff's intent on the meaning of the contract provisions at the time the contract was entered into.

. . .

In 2013, the only argument/explanation provided to the Court for the Plaintiff's contract interpretation was the text. Limited to that, the Court held that the textual construction asserted by the Defendant prevailed. While not unreasonable nor irrational, the Plaintiff's interpretation for the reasons cited by the Court in its 2013 orders did not prevail.

Now the Court has another argument/explanation that the parties mutually intended and agreed to the contract language to having the meaning asserted by the Plaintiff herein. This argument/explanation creates a genuine issue of material fact on whether the parties mutually agreed and intended for the language used in the parties' agreements to express the terms now asserted by the Plaintiff. Accordingly, on these points, Defendant's summary judgment is denied.

As authority for the foregoing conclusion, the Court relies upon *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co., Inc.* 69 Cal. 2d 33, 442 P.2d 641, 69 Cal, Rptr. 561 (S. Ct. Cal. 1968), cited in *Asare*, 1

Cal. App. 4th 856, 863 contained in the American Jurisprudence quotation above.

The case proceeded to trial. At trial, the court heard the testimony of numerous witnesses, including three of IHS's employees and four former BlueCross employees. Over the objection of BlueCross, the trial court permitted these individuals to testify regarding the negotiation of the 1999 agreement.[4] IHS also presented the testimony of two partners from Royalty Compliance Organization ("Royalty") regarding IHS's alleged damages. During the course of discovery, IHS retained Royalty to perform an accounting of BlueCross' records and assess IHS's allegation of underpayment of commissions. At trial, these individuals presented several damage "schedules" based on the results of their audit. They opined that BlueCross had underpaid IHS by nearly $34 million during their 13-year contractual relationship. The damage schedules were based on a line-by-line analysis of data, as well as audit sampling and extrapolation techniques; however, they did not breakdown damages for each cause of action and did not identify which portion of the damages was suffered outside the limitations period.

On rebuttal following the close of BlueCross's case-in-chief, IHS attempted to introduce two damages exhibits, purporting to breakdown its damages by claim and the amount of damages falling outside the limitations period. BlueCross objected because IHS had not introduced such evidence during its case-in-chief and the trial court excluded the proposed exhibits. However, after trial, the court *sua sponte* instructed IHS to submit a post-trial submission breaking down its damages by claim. BlueCross objected, arguing that introduction of this calculation after trial would constitute an "improper re-opening of proof"; however, the trial court allowed IHS to submit this evidence.

On September 3, 2015, the trial court entered a Memorandum and Order of Trial Findings of Fact and Conclusions of Law. Relying on the text of the 2009 agreement and the parol testimony offered by IHS, the court found that BlueCross breached the 2009 agreement by making the May 2011 commission schedule retroactive to the renewal of existing policies and by failing to pay post-termination commissions directly to IHS. The court also held that BlueCross systemically underpaid commissions throughout the parties' 13-year contractual relationship. Regarding BlueCross's statute of limitation's defense, the court held that the discovery rule tolled the statute of limitations defense because the underpayments were "inherently undiscoverable."

As for damages, the court accepted Royalty's line-by-line damages models and awarded IHS $1,968,765 in damages for specified contractual breaches. The court also

---

[4] The trial court reiterated its reliance upon *Pacific Gas*, and its position that consideration of parol evidence was appropriate to ascertain the parties' intentions with regard to the 1999 and 2009 agreements.

awarded $142,735 in prejudgment interest on this award for a total judgment of $2,111,500. As for the remaining claims, the court found that Royalty's damage models were based on extrapolation and audit sampling and concluded that the sampling was "not representative." Therefore, these claimed damages were denied.

The trial court rejected IHS's indemnity claim, holding that the indemnity provision does "not apply to a contract dispute between the contracting parties; it applies to third-party claims." In pertinent part the court reasoned that

> [T]he Article VI indemnity text is not unique. Instead, the Article VI indemnity text is very similar and analogous to indemnity provisions precedentially construed by appellate courts, some of which are cited and quoted above. That law governs and decides this issue. Based upon the case law cited above, the Court dismisses the Plaintiff's claim for indemnity.

The court also dismissed IHS's claims for conversion and unjust enrichment claims as duplicative of its breach of contract claim.

Thereafter, both parties moved to alter or amend the court's order on various grounds. BlueCross argued, *inter alia*, that the court mistakenly awarded almost one million dollars in damages for commissions that BlueCross had already paid to IHS's subagents. For its part, IHS asked the court to reconsider, *inter alia*, its holding that IHS was not entitled to attorney's fees under the indemnity provision.

On December 22, 2015, the trial court entered an order denying BlueCross's motion in its entirety. As for IHS's motion, the court granted it in regard to the indemnity provision, finding that IHS was entitled to recover its attorney's fees; however, the trial court stated that it would hold the amount of the fees to be awarded in abeyance pending an appeal. Thereafter, the trial court certified its order as a final judgment pursuant to Rule 54.02.

BlueCross initiated this appeal and it raises the following issues:

1.    Whether the Agreement's standard "hold harmless" indemnity provision allows IHS to recover litigation and attorney's fees in this contractual dispute with BlueCross.

2.    Whether the Agreement authorized BlueCross to unilaterally adopt the May 2011 Commission Schedule and apply the new commission rates to existing insurance policies.

3.      Whether the Agreement permitted BlueCross to pay commissions directly to producing agents after BlueCross terminated its general agency relationship with IHS.

4.      Whether Tennessee's six-year statute of limitations bars IHS's breach of contract claims seeking commissions allegedly owed before July 29, 2005.

5.      Whether the chancery court mistakenly awarded IHS almost one million dollars in damages that BlueCross previously paid to IHS's subagents and calculated damages based on IHS's post-trial submissions.

IHS raises the following issues:

1.      Whether the trial court erred in declining to award IHS $1.8 million in damages for 2011 and 2012 caused by BlueCross's retroactive reduction of renewal commission rates when IHS provided the trial court with "sufficiently certain" evidence of these damages and the trial court merely had to perform mathematical calculations to reasonably assess these damages.

2.      Whether the trial court erred in declining to award its Schedule 6 damages on the basis that these damages were "speculative" when the evidence preponderated against the only alleged fact supporting the trial court's conclusion.[5]

## STANDARD OF REVIEW

The issues on appeal arise from a lengthy bench trial. "In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial

---

[5] Royalty Compliance Organization prepared a financial report to support IHS's claims for monetary damages. Schedule 6 of Royalty's damage report indicates that BlueCross underpaid commissions on individual insurance policies sold by IHS. Specifically, Royalty determined that from 2000 to 2012, BlueCross received $3.8 billion in premiums from the sale of individual insurance policies. BlueCross paid $2.1 billion (or 54% of the $3.8 billion) to IHS and its subagents, and the other BlueCross general agents, as commission on sales. The remaining $1.7 billion (or 46% of the $3.8 billion) was retained by BlueCross. Royalty determined that 77% of the $3.8 billion should have been paid as commission on sales instead of 54%. Thus, BlueCross underpaid its agents by $881 million. Schedule 6 calculates IHS's share of this $881 million, which according to Royalty, is $20,899,010.

court's factual findings de novo upon the record, accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 598-99 (Tenn. Ct. App. 2006). Our review of a trial court's determinations on issues of law is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

## ANALYSIS

### I. THE MAY 2011 COMMISSION SCHEDULE

BlueCross contends the trial court erred by holding that it breached the 2009 agreement by unilaterally applying the May 2011 commission schedule to existing insurance policies.

The resolution of this issue involves the interpretation of a contract. Contract interpretation is a matter of law and, therefore, is reviewed de novo without a presumption of correctness. *Ray Bell Const. Co., Inc. v. State, Tenn. Dept. of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011). The primary task in interpreting a contract is to ascertain and to give effect to the intent of the contracting parties. *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 454, 465 (Tenn. 2012) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). As our Supreme Court has explained, the search for the parties' intent should focus on the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract. *Hughes*, 387 S.W.3d at 465.

For example, in *Hamblen County v. City of Morristown*, the Supreme Court considered a contract dispute between a city and county as to which entity should be permitted to operate two newly constructed high schools. *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983). The schools were located within the city limits, but pursuant to an agreement between the city and county, construction of the schools was financed by the county and the schools were "leased to the [city] for such time and *so long as* the same is used for educational purposes for city and county students." However, the contract did not expressly address the issue of which school board would control the schools after construction. *Id.*

In ruling on this issue, the Supreme Court explained that the overriding purpose of interpreting a contract is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles. It further noted:

The court in interpreting *words or other acts* of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity *it is permissible to consider the situation of the parties* and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.

*Id.* at 333-334 (internal citations omitted) (emphasis added). Additionally, the Supreme Court applied the "rule of practical construction" in determining the intent of the parties. As the court explained,

The rule of practical construction is particularly applicable to this case. That rule, long recognized and applied in this jurisdiction, is that the interpretation placed upon a contract by the parties thereto, *as shown by their acts*, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered. *Womble v. Walker*, 181 Tenn. 246, 181 S.W.2d 5 (1944); *American Barge Line Co. v. Jones & Laughlin Steel Corporation*, 179 Tenn. 156, 163 S.W.2d 502 (1942); *Sherman v. Cate*, 159 Tenn. 69, 16 S.W.2d 25 (1929).

The rule is stated in Section 235 of the *Restatement of Contracts* as follows:

"If the *conduct of the parties* subsequent to a manifestation of intention indicates that all of the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

*Id.* at 335 (emphasis added).

Applying this rule, the court determined that it was "apparent from the *conduct of the parties* that they intended under the . . . contract that the [city] and its school board should have control and administration of these two high schools." *Id.* (emphasis added). Specifically, the court found that "for at least ten years following the execution of the contract . . . the parties conducted themselves as though the contract had expressly provided for the city to control and operate the high school system." *Id.* Therefore, the court held that the contract granted the city the exclusive power to operate and administer the two high schools. *Id.* at 336.

Here, the trial court held that BlueCross's retroactive application of the new 2011 commission schedule constituted a breach of the 2009 agreement. In reaching this

- 12 -

conclusion, the court considered not only the language of the parties' contract, but also parol evidence from former BlueCross employees. The trial court also relied on the rule of practical construction and *Hamblen County*. After reviewing the record, we have concluded that the rule of practical construction, as applied in Tennessee, does not authorize the courts to consider what witnesses *thought* or *believed* the parties intended when the agreement was being negotiated. To the contrary, the rule of practical construction permits the court to consider *the situation* of the parties at the time of contracting as well as *the acts or conduct* of the parties in ascertaining their intent. *See Hamblen Cnty.*, 656 S.W.2d at 335.

The issue in the present case is whether the commission rates stated in each commission schedule "vested" or whether BlueCross was free to apply the new rates retroactively for renewals on existing policies. Although the 1999 and 2011 agreements do not expressly address this issue, the parties' conduct after each new commission schedule went into effect from 1999 through 2010 reveals the intentions of BlueCross and IHS to apply the rates prospectively only.

The 1999 agreement provided that IHS would be compensated "as approved and set forth in Addendum: General Agency Goal and Commission, which is attached hereto and incorporated by reference herein." The initial commission schedule listed the various insurance products offered by BlueCross and the commission rates for each product. It also provided that the schedule "shall be subject to change by BlueCross . . . ."

As authorized by the agreement, BlueCross modified the commission schedule on several occasions: April 2004, June 2005, October 2005, January 2006, December 2006, June 2008, and November 2008. Each of these commission schedules stated,

> This Commission Schedule supplements any previous Commission Schedule you may have received; **commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made.**

(Emphasis added). Additionally, in each commission schedule, BlueCross "reserv[ed] the right to modify or change the commission and payment schedules with appropriate notification."

Like the 1999 agreement, the 2009 agreement incorporated a commission schedule which was attached. As before, the commission schedule stated that it "supplements any previous Commission Schedule you may have received," and provided that "commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made." The 2009 commission schedule also reserved BlueCross's right to "modify or change the commission and payment schedules with appropriate notification."

Further, BlueCross exercised its right to modify the commission schedule in February 2010. This modification contained language identical to that quoted above from the prior commission schedules. However, in 2011 BlueCross altered course by modifying the renewal commission rates for existing insurance policies, which it had not done previously.

As our Supreme Court has noted, "if the conduct of the parties subsequent to a manifestation of intention indicates that all of the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation." *Hamblen Cnty.*, 656 S.W.2d at 335. Here, in every commission schedule promulgated from 1999 until the 2010, the new commission schedule "supplement[ed]" the prior commission schedules and stated that "commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made." Although BlueCross correctly notes that they possessed the authority to "modify or change the commission and payment schedules," we believe the parties' conduct for the first eleven years of their relationship shows that, at the time of contracting, they intended the commission rates to be "vested" for existing insurance policies and that each modification would apply prospectively. Thus, BlueCross could impose a new commission schedule on IHS for any policies issued prospectively but not retrospectively on policies for which the commission rates had vested.

Therefore, we affirm the trial court's conclusion that BlueCross breached the 2009 agreement by applying the renewal commission rate to existing policies.

## II. PAYMENT OF COMMISSIONS DIRECTLY TO IHS'S SUBAGENTS

BlueCross contends the trial court erred by holding that it breached the 2009 agreement by paying commissions directly to IHS's subagents after termination of the agreement on February 23, 2012.

Article XIII of the 2009 agreement provided for compensation to IHS (referred to as "General Agent") and its subagents (referred to as "Producing Agents") as follows:

> All compensation due to General Agent or Producing Agents will be paid directly to General Agent. General Agent is solely responsible for any compensation owed to Producing Agents. The parties agree that in the event General Agent is no longer able, entitled or available to receive Commissions, [BlueCross] shall use its best efforts to contract individually with the Producing Agents pursuant to an Individual Products Agency Agreement in use by [BlueCross] at that time. . . .

BlueCross contended it acted within its rights to pay commissions directly to the subagents after February 23, 2012, because IHS was no longer "able, entitled or available" to receive renewal commissions on policies procured by IHS's subagents. The trial court determined that BlueCross's position was not supported by the evidence. We agree.

As the 2009 agreement expressly stated, IHS was entitled to continue receiving renewal commissions following termination.[6] Moreover, IHS was still conducting business at the time of and following the effective date of termination of the agreement by BlueCross. Moreover, and significantly, there is no credible evidence that IHS was not "able" and "available" to receive or forward commissions owed to its subagents at that time. Therefore, as the trial court correctly ruled, BlueCross breached the agreement by paying renewal commissions directly to IHS's subagents following termination of the agreement.

### III. STATUTE OF LIMITATIONS

BlueCross argues that the trial court erred by rejecting its statute of limitations defense.

In Tennessee, an action for breach of contract must be brought within six years after the cause of action accrued. Tenn. Code Ann. § 28-3-109(a)(3). Under the discovery rule, a cause of action "accrues" for statute of limitations purposes when the plaintiff has either actual knowledge of a claim or has actual knowledge of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (citing *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995)). The latter circumstance is referred to as "constructive notice" or "inquiry notice" and "charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed . . . . [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate 'the injury,' the limitation period begins to run." *Id.* (citing *Sherrill v. Souder*, 325 S.W.3d 584, 593 n.7 (Tenn. 2010)) (alteration in original); *see also Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996) (defining inquiry notice as the "notice which a plaintiff would have possessed after due investigation.").

This action was commenced on July 29, 2011. In pertinent part, IHS sought to recover damages for underpayment of commissions owed since 1999. In its answer,

---

[6] The relevant provision specifically stated: "This Agreement may be canceled at any time for any reason by either party hereto upon ninety (90) days prior written notice. . . . Neither party and no Producing Agent shall have any claim against the other for any alleged loss of prospective profits or commissions . . . , with the exception that **renewal commissions for policies with effective dates prior to termination will continue to be paid by [BlueCross]**." (Emphasis added).

BlueCross contended that the six-year statute of limitations barred IHS's claims for commissions owed before July 29, 2005. The trial court rejected this argument, holding that the discovery rule tolled the statute of limitations. The court reasoned as follows:

> [T]he Court's initial determination is that as a matter of law the discovery rule applies to breach of contract claims. The Court of Appeals explained the law in *McGhee v. Shelby Cnty. Gov't*, No. W2012-00185-COA-R3-CV, 2012 WL 2087188, at *9 (Tenn. Ct. App. June 11, 2012) that the discovery rule applies in cases where the breach of contract is inherently undiscoverable:
>
> . . .
>
>> As a general matter, there will be little need for the discovery rule in most breach of contract cases. A buyer is immediately aware of a breach upon the delivery of nonconforming goods, and a seller knows of the breach when payment is delinquent. However, it is not difficult to envision circumstances in which a party to a contract would not be aware that the other party has breached the contract. In those circumstances, just as in tort claims involving personal injuries, it would be unjust to hold that a plaintiff's claim for breach of contract accrues before the plaintiff knew or should have known that the contract had been breached.
>>
>> Many courts now apply the discovery rule to breach of contract claims and hold that a cause of action for breach of contract begins to run when a party either discovers the breach or could have or should have discovered the breach through the exercise of reasonable judgment. These courts have invoked the discovery rule in cases where (1) the breach of contract was difficult for the plaintiff to detect, (2) the defendant was in a far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged. Stated another way, the discovery rule applies in cases where the breach of contract is inherently undiscoverable.
>>
>> A breach of contract is "inherently undiscoverable" when the injured party is unlikely to discover the wrong during the limitations period despite due diligence. To be inherently undiscoverable, the wrong and injury must be unknown to the

plaintiff because of their very nature and not because of any fault of the plaintiff.

*Goot* [*v. Metro. Gov't of Nashville and Davidson Cnty.*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *38-40 (Tenn. Ct. App. Nov. 9, 2005)] (internal citations omitted).

As well, in *Taylor v. Metro. Gov't of Nashville & Davidson Cnty.*, [No. M2007-01774-COA-R3-CV], 2008 WL 5330502, at *7-8 (Tenn. Ct. App. Dec. 19, 2008), the Court of Appeals held that the discovery rule is applicable to a breach of contract case when the breach is inherently undiscoverable[.]

. . .

Applying this law to the evidence, [IHS] proved in several ways that prior to 2011, when [IHS analyzed its internal records], [BlueCross's] underpayment of commissions was inherently undiscoverable.

First, there was a disparity of knowledge, and it was [BlueCross] who had superior knowledge and control. The proof established that [BlueCross], in the first instance, determined the information reported to [IHS] on the monthly commission statements. Additionally, [IHS's] information in SLIM [IHS's internal database] was dependent upon the reliability of [BlueCross's] information which was shown by [IHS] to be unreliable. Further, the Court accredits the testimony of Mr. Conroy who designed the SLIM system that it could not detect underpayments of commissions, and such underpayments were inherently undiscoverable by [IHS].

Additionally, [IHS] did not have access to the following information which the proof established was necessary to determine underpayments:

— [BlueCross's] Facets system [its commission reporting and payment system]
— [BlueCross's] cross reference table with Broker Ids
— Applicants' social security numbers
— All termination notices
— All renewal notices

The proof further established that [IHS] was diligent in attempting to detect errors by reviewing the monthly commission statements from [BlueCross], preparing reports for subagents, taking and responding to

- 17 -

subagents' underpayment or nonpayment inquiries and continuously contacting [BlueCross] to track these down, and finalizing and transmitting a report and commission check to each subagent. The proof revealed, however, that [IHS's] ad hoc inquires about commission issues over the years of the General Agency Agreement could not uncover the systemic underpayments because of the variety and non-routine occurrence of the issues, and insufficient information to perform checks.

In addition, there was proof that [BlueCross] knew about the faultiness of Facets [its commission reporting and payment system] and the likelihood of significant amounts of commission payment errors which knowledge was not shared with [IHS]. There was abundant proof, contained in the above findings, that over the life of the [General Agency Agreement] [BlueCross] knew the deficiencies and faultiness of Facets, the likelihood and ongoing occurrence of errors in commission credit due to human error in manual adjustments, and that two Ernst & Young audits had flagged payment of incorrect commission rates due to internal controls. Yet the proof was clear that [IHS] was not told this. [BlueCross] created a sense of security that there were no problems with Facets other than the ad hoc questions by IHS.

[BlueCross] also inhibited inquiry by [IHS] with promises of a new system "Callidus." The Court accredits the testimony of [IHS's] witnesses that at a dinner with [BlueCross] in March of 2010 . . . the [BlueCross] representatives assured [IHS] that Callidus would be implemented soon and would improve the commission reporting and payment system. Ultimately Callidus was not implemented by [BlueCross]. The Court finds that beginning in 2008, [BlueCross] studied Callidus to upgrade Facets to address the recurring errors. By December of 2009 [BlueCross] was implementing Callidus but had to abandon that because it was unable to exchange data with Facets. [IHS], however, was not told any of this.

Based upon all of the above evidence, the Court concludes that continuous, ongoing underpayments were inherently undiscoverable by [IHS], and the statute of limitations is tolled.

After reviewing the record, we conclude that the evidence does not preponderate against the trial court's findings. As discussed above, a cause of action "accrues" for statute of limitations purposes when the plaintiff has either actual knowledge of a claim or has actual knowledge of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Redwing*, 363 S.W.3d at 459 (citing *Carvell*, 900 S.W.2d at 29). Here, IHS did not have actual knowledge of underpayment of commissions by BlueCross. Moreover, IHS could not have discovered

this information through reasonable investigation because IHS's internal database was dependent upon the reliability of BlueCross's information, which was shown to be unreliable. As a consequence, a reasonable person or entity such as IHS could not have detected underpayments of commissions through reasonable investigation.

Therefore, we affirm the trial court's conclusion that IHS's claims are not barred by the statute of limitations.

## IV. DAMAGES

Both parties raise issues concerning the trial court's award of damages in this case. BlueCross argues that the trial court mistakenly awarded IHS approximately $984,028.41 in commission damages, a portion of which BlueCross already paid to IHS's subagents. IHS contends that the trial court erred by (1) declining to award it $1.8 million in damages caused by BlueCross's retroactive reduction of renewal commission rates; and (2) declining to award IHS damages under Schedule 6 of Royalty's damage report on the basis that they were "speculative." We will consider each issue in turn.

### A. DAMAGES FOR FAILURE TO PAY COMMISSIONS DIRECTLY TO IHS

BlueCross argues that the trial court mistakenly awarded IHS approximately $984,028 in commission damages, a figure that included payments that BlueCross already made to IHS's subagents.

The burden of proving damages rests on the party seeking them, *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012), and without sufficient proof of damages, there can be no award of damages. *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). "The law does not require exactness of computation in suits that involve questions of damages growing out of contract or tort." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006) (citing *St. John v. Bratton*, 150 S.W.2d 727, 729 (Tenn. Ct. App. 1941)). However, the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages. *Id.* In short, a plaintiff may recover damages when she offers "proof of damages within a reasonable degree of certainty." *Discover Bank*, 363 S.W.3d at 496 (quoting *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985)).

The amount of damages awarded by a trial court is a question of fact which we review de novo with a presumption of correctness, unless the preponderance of the evidence is otherwise. *Moody v. Lea*, 83 S.W.3d 745, 751 (Tenn. Ct. App. 2001). "[W]e will alter the amount of damages only when the trial court has adopted the wrong measure of damages or when the evidence preponderates against the amount of damages awarded." *Id.* (citing *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998);

*Armstrong v. Hickman Cnty. Highway Dep't*, 743 S.W.2d 189, 195 (Tenn. Ct. App. 1987); Tenn. R. App. P. 13(d)).

At trial, IHS presented a report prepared by the Royalty Compliance Organization ("Royalty"), an accounting firm hired by IHS during discovery to perform an audit on BlueCross's payment records. This report included six lengthy "damage schedules" specifying IHS's purported damages. Schedule 4 dealt with damages allegedly owed due to BlueCross's failure to pay commissions directly to IHS. Royalty's report summarized the findings of Schedule 4 as follows:

> 4. <u>Policies with an IHS broker not paid through IHS - $984,028</u>
>
> We have identified policies that are paid to an incorrect agency or to the broker directly bypassing IHS. We only included those payments made directly to the broker. IHS has said mistakes like this have occurred often but the brokers make more by going through IHS and they would not choose to do this. We have removed all policies included in Schedule 1 [dealing with the underpayment of commissions on group policies]. This analysis is based on active dates of the IHS brokers. The commission paid on these policies is often at a lower rate than the rate that would have been paid if the commission would have been correctly paid to IHS. The additional amount due of $984,028 is shown in Schedule 4.

IHS also presented the testimony of Wayne Coleman, the partner from Royalty who prepared the report. Mr. Coleman described the procedure and methodology for compiling Schedule 4 as follows:

> We determined, through . . . data analysis that was done, that certain policies were paid to an IHS broker but was [sic] not paid to IHS. We looked to make sure that one - - were any of these on Schedule 1 or any other schedules, and we removed them from Schedule 1, as I recall. We looked to see if they were paid to another general agent. And what's remaining on Schedule 4 is purely policies which were paid to IHS brokers that were active during this period of time and where we identified these as being IHS policies.
>
> . . .
>
> [T]he information [contained in Schedule 4] comes from different locations. Part of it comes from the commission addendums that told us what the rates were. Part of it comes from . . . Facets [BlueCross's commission reporting and payment system]. It tells us what the - - the commission payments were. . . .

[T]his data analysis, the extraction of this information comes from the relational databases that we have prepared based upon all the data we received from BlueCross BlueShield as well as using the SLIM database that we got from IHS.

Additionally, on cross-examination, counsel for BlueCross questioned Mr. Coleman regarding his damages calculations as follows:

**Attorney for BlueCross:** Now, it's your opinion - - what you're telling the Court here is that BlueCross owes IHS $984,028.41; right?

**Mr. Coleman:** Yes.

**Attorney for BlueCross**: Now, if BlueCross had paid that to IHS in the regular course of business, IHS, of course, would have turned around and cut a check to the subagent; right?

**Mr. Coleman:** That's my understanding.

**Attorney for BlueCross**: And that amount on a global scale would have [been] $923,903.97; correct?

**Mr. Coleman:** Correct.

**Attorney for BlueCross**: And so what IHS would have kept, had they paid them directly, would have been the difference between 984K and 923K; is that right?

**Mr. Coleman**: I believe that's correct.

**Attorney for BlueCross**: So roughly $60,000?

**Mr. Coleman**: Roughly.

**Attorney for BlueCross**: Now, are you telling this Court that in this case if she rules against BlueCross that she should award IHS the full $984,028.41?

**Mr. Coleman:** Correct.

**Attorney for BlueCross**: Even though we've already paid the subagent $923,000?

**Mr. Coleman:** Well I don't really know that you paid those subagents, but I do know the responsibility for BlueCross is to pay IHS. IHS's responsibility was to pay the subagent.

Based on this testimony, BlueCross argued at trial that they already paid approximately $923,000 of the $984,028 owed to IHS's subagents; thus, they contended that IHS is only entitled to $60,124.44 as damages for this breach. The trial court rejected this argument, finding as follows:

[T]he Court finds the evidence did not establish that [BlueCross] has already paid $923,000 of the amount on Schedule 4 directly to subagents. [BlueCross] provided no proof of such a payment, and its examination of Plaintiff's expert, Mr. Coleman, on this issue yielded ambiguous testimony, insufficient to prove such a payment. Accordingly, no credit is due [BlueCross] on this Schedule, and the Court awards Plaintiff $984,028 in unpaid commissions.

Thereafter, IHS filed a motion to alter or amend the judgment, arguing that the trial court erred in awarding IHS $984,028 in damages for its failure to pay commissions directly to IHS. After a hearing, the trial court denied this motion.

On appeal, BlueCross contends this decision was in error and correctly notes that IHS had the burden at trial of establishing its damages. *See Discover Bank*, 363 S.W.3d at 496. After reviewing the record, we believe that IHS succeeded in this regard. Specifically, IHS presented as evidence, *inter alia*, Royalty's damage schedules and the specific testimony of Mr. Coleman. This evidence showed that BlueCross owed IHS approximately $984,028 arising out of its failure to pay commission directly to IHS. Further, Mr. Coleman testified that, had BlueCross paid IHS this amount, approximately $923,000 would have been paid to IHS's subagents. The remainder—approximately $60,000—would have been retained by IHS.

BlueCross claims that it paid $923,000 to IHS's subagents; thus, the trial court erred by awarding to IHS the entire $984,028. However, BlueCross bore the burden of providing specific evidence showing payment to IHS's subagents. *See Int'l Correspondence School v. Crabtree*, 34 S.W.2d 447, 449 (Tenn. 1931) ("[T]he defendant has the onus of establishing matters asserted by him in mitigation or reduction of the amount of plaintiff's damages."); *see also Morrison v. Allen*, 338 S.W.3d 417, 436 (Tenn. 2011) (holding that a party asserting a claim to a setoff or a reduction of damages has the burden of establishing their right to such a reduction). At trial, BlueCross relied on Mr. Coleman's testimony and the information contained in its Facets database as proof of payment. However, Mr. Coleman testified that he was unaware of whether BlueCross

actually paid IHS's subagents. Thus, this evidence does not support BlueCross's argument.

Further, BlueCross failed to identify any specific evidence from this extremely voluminous record showing that it paid the $923,000 at issue to IHS's subagents. It is not incumbent upon the court to "blindly search the record in order to find proof to substantiate allegations of the parties or any other evidence to support a party's contentions." *Brummitte v. Lawson*, 182 S.W.3d 320, 323 (Tenn. Ct. App. 2005) (quoting *Pearman v. Pearman*, 781 S.W.2d 585, 588 (Tenn. Ct. App. 1989)); *see also U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Therefore, BlueCross failed to meet its burden of proof. Accordingly, we conclude that the evidence does not preponderate against the trial court's findings.

B. DAMAGES FOR RETROACTIVE APPLICATION OF NEW COMMISSION RATES

IHS argues that the trial court erred when it declined to award IHS damages caused by BlueCross's retroactive application of its commission rates.

As discussed above, at trial IHS presented a report outlining its purported damages in six damage schedules. Importantly, however, this report did not specifically calculate the amount of damages owed as a result of the retroactive reduction of commission rates in the May 2011 commission schedule (the "rate reduction damages"). In an attempt to explain its damages further, IHS presented the expert testimony of Darla Crain, a partner with Royalty, during its case-in-chief. Ms. Crain testified that Schedule 1 of Royalty's damage report, which contained a global figure of damages related to BlueCross's underpayment of commission on group insurance policies, could be used to quantify the rate reduction damages. However, when Ms. Crain began to testify as to the method for assessing the rate reduction damages and the total amount of these damages, BlueCross objected on the basis that neither Ms. Crain nor Royalty had ever disclosed such an opinion at any prior time. The trial court initially overruled this objection, and Ms. Crain testified that BlueCross owed rate reduction damages in the amount of $1.8 million. BlueCross then moved to strike Ms. Crain's testimony related to the rate reduction damages and the trial court granted the motion.

During its rebuttal, IHS sought to quantify its damages resulting from the retrospective application of the 2011 rate reductions by introducing two exhibits. BlueCross objected on the grounds it was improper rebuttal evidence. The trial court sustained the objection, finding that it would be unfairly prejudicial to admit the evidence at this time because BlueCross did not have time to meaningfully analyze this evidence or consult with their experts.

During closing arguments, counsel for IHS attempted to explain the method for calculating rate reduction damages. In so doing, he relied on Exhibit K of Royalty's

damages report, which is a table summarizing the commission payments made by BlueCross from 2000-2012 and stating the applicable commission rate for each payment.

Following trial, the court submitted a request for post-trial filings from the parties. This request sought, *inter alia*, the calculations for each type of damages sought and asked the parties to identify the trial exhibits used in reaching these calculations. In its response to this request, IHS stated that its rate reduction damages could be calculated using Exhibit K of Royalty's report under the methodology outlined during its closing argument. Conversely, BlueCross argued that,

> The Court should not consider IHS's counsel's attempts to backdoor calculations purportedly showing the impact of the rate reduction offered for the first time in his closing argument especially in the light of the unreliable nature of this calculation and the fact that the Court already excluded Ms. Crain's testimony on this same point on two different occasions. By extension, the Court should not consider any calculation of the amount associated with the rate reduction offered in response to this question for the same reasons that it already struck Ms. Crain's testimony on this same topic. Allowing this evidence in at this point would allow IHS to introduce the evidence without giving the Defendant any opportunity to challenge this assertion which is unfair and prejudicial in light of the fact that IHS has known for years that this category of damages is a hotly-contested issue in this case and should have quantified it.

After considering the evidence and post-trial filings, the trial court entered its Memorandum and Order of Trial Findings and Conclusions of Law. With regard to the rate reduction damages, the trial court determined that it could not award rate reduction damages under Schedule 1 for the reasons identified by BlueCross in its response to the Request for Post-Trial Filings.

On appeal, IHS argues that this decision was in error because it presented "sufficiently certain" evidence—i.e., Exhibit K—from which the trial court could have reasonably assessed its damages. Like the trial court, we are not persuaded.

Despite the fact that IHS had the burden of proving its damages, *see Discover Bank*, 363 S.W.3d at 496, it presented no proof at trial specifically setting forth its rate reduction damages. Instead, during closing arguments IHS argued that the trial court could assess its damages by performing mathematical calculations based on Exhibit K. Although "[t]he law does not require exactness of computation in suits that involve questions of damages," *St. John*, 150 S.W.2d at 729, as mentioned above, it is not incumbent upon the court "to find proof to substantiate allegations of the parties or any other evidence to support a party's contentions." *Brummitte*, 182 S.W.3d at 323 (quoting *Pearman*, 781 S.W.2d at 588).

Having concluded that IHS failed to meet its burden of proof on this issue, we affirm the trial court's decision to not award damages based on the retroactive reduction of commission rates.

## C. UNDERPAYMENT OF COMMISSIONS ON INDIVIDUAL INSURANCE POLICIES

IHS argues that the trial court erred in concluding that Schedule 6 of Royalty's damage report, which outlined damages related to the underpayment of commissions on individual insurance policies, was speculative.

At trial, IHS's expert, Darla Crain, explained the damages calculated in Schedule 6 as follows. From 2000 to 2012, BlueCross received $3.8 billion in cash through the sale of individual insurance policies. According to BlueCross's records, $2.1 billion of this cash (or 54%) was "commissionable"—i.e., subject to payment to BlueCross's agents (including IHS) as commission on sales. The remaining $1.7 billion (or 46%) was "non-commissionable." However, Royalty determined these figures were inaccurate after reviewing BlueCross's Sales Summary Reports, which are yearly summaries of BlueCross's sales broken down by product line and by who sold the product. Instead, Royalty determined that 77% of the $3.8 billion was attributable to commissionable sales and 23% was attributable to non-commissionable sales. Stated differently, Royalty concluded that $881 million of the $3.8 billion in cash was originally misclassified as "non-commissionable," and should have been classified as "commissionable" and paid to BlueCross's agents. Royalty determined that IHS's sales accounted for 2.52% of the "total commissionable cash." Therefore, it calculated damages owed to IHS in the amount of $20,899,010.

In response, BlueCross presented the testimony of its expert, Dr. Juan Gonzalez, who testified that Royalty's methodology for calculating its Schedule 6 damages was flawed. Specifically, Dr. Gonzalez testified that Royalty's determination that 77% of the sales were "commissionable" was improper. He also stated that Royalty should have developed a model to explain why BlueCross's data was showing only 54% in "commissionable" premiums when Royalty anticipated that the number should be 77%. Further, Dr. Gonzalez testified that the Sales Summary Reports used by Royalty in calculating the Schedule 6 damages were unreliable in proving the 77/23 commission split because these reports reflected sales, not premiums collected.

Additionally, Gary Bynum, a manager of marketing operations at BlueCross, testified regarding the Sales Summary Reports. Mr. Bynum testified that, because of the volatility of individual insurance policies, the information included in the Sales Summary Reports is an estimate. For example, if an individual purchased a BlueCross insurance policy, the monthly premiums for that policy would be used along with other policy premiums to calculate the average monthly premiums received by BlueCross for the

entire year, even if that individual canceled his or her insurance policy after one month. As a result, Mr. Bynum testified that the Sales Summary Reports overstated BlueCross's premium income.

After considering the evidence, the trial court denied recovery on the Schedule 6 damages on the ground that the damages were speculative. Specifically, the court determined that IHS failed to prove the underlying premise upon which Schedule 6 was based, the 77/23 percent split of commissionable verses non-commissionable premiums. The court noted that the only data to support the 77/23 split was the Sales Summary Reports; however, the court determined this evidence was "neutralized" by Mr. Bynum's testimony that the reports were averages.

Courts are not permitted to award damages based on mere conjecture or speculation. *BancorpSouth Bank, Inc.*, 223 S.W.3d at 228. The evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages. *Id.* After reviewing the record, we conclude that IHS has failed to satisfy this standard. Therefore, the trial court's decision on this issue is affirmed.

## V. THE INDEMNIFICATION PROVISION

### A. THE CONTENTIONS OF THE PARTIES AND AMICI CURIAE

BlueCross contends the trial court erred by considering parol evidence to ascertain the intent of the parties because the parties negotiated and executed "a fully integrated contract to govern their general agency relationship," the terms of which were unambiguous. It further contends the trial court not only violated "Tennessee's longstanding and robust parol evidence rule" but, by doing so, it violated "the Agreement's integration clause, which reaffirms the parties' intent that the Agreement be interpreted without resort to extrinsic evidence." Further, BlueCross contends the trial court should have ascertained the meaning of the indemnity provision from the "four corners" of the agreement and applied the established meaning of the term "indemnity."

IHS contends the trial court acted appropriately by considering parol evidence to ascertain the intention of the parties. As IHS states in the summary of its argument:

> To avoid the agreed upon intent of the foregoing contract provisions - which intent was confirmed not only by IHS but by the very BlueCross executives who negotiated these provisions - BlueCross argues that this Court should bury its head in the sand and ignore the parties' testimony through a misapplication of the parol evidence rule. Not only does this argument ask the Court to ignore the cardinal principal of contract interpretation - to ascertain the parties' intent - but it miscomprehends

Tennessee law, pursuant to which courts may always consider extrinsic evidence to interpret or explain, rather than contradict, contract terms. That is exactly what the Trial Court did in the instant case.

Four chambers of commerce in Tennessee filed amici curiae briefs in support of BlueCross on this issue. The Tennessee Chamber of Commerce & Industry ("the Tennessee Chamber") filed an amicus curiae brief, and the Nashville Area Chamber of Commerce, the Greater Memphis Chamber, and the Chattanooga Area Chamber of Commerce filed a joint amici curiae brief in support of BlueCross.

The Tennessee Chamber explains its reasons for filing a brief as follows:

In 2015, the Tennessee Supreme Court created a specialized business court to serve as "an effective tool for business retention, economic development, and enhanced effectiveness of the judicial system." Order Establishing the Davidson County Business Court Pilot Project, at 1, No. ADM2015-00467, (Tenn., March 16, 2015). To achieve these objectives, the Supreme Court tasked the business court with developing "a body of rulings from which lawyers and litigants can better predict and assess outcomes in business cases." *Id*. at 2.

The ability of lawyers and litigants to better predict and assess outcomes derives in large part from predictable judicial interpretation and enforcement of unambiguous contracts. In fact, it is critical to the success of Tennessee businesses. Precipitous changes in long-standing rules of contract interpretation, specifically the parol evidence rule, would have a detrimental impact on all contracting parties by creating uncertainty and increasing the likelihood of litigation. "The [parol evidence] rule is founded on experience and public policy, created by necessity, and designed to give certainty to a transaction that has been reduced to writing by protecting the parties against the doubtful veracity and uncertain memory of interested witnesses." 11 WILLISTON ON CONTRACTS § 33:1 (4th ed.) (internal citations omitted).

It is important to the Chamber and its members that Tennessee courts, in particular Tennessee's new business courts, interpret fully integrated and unambiguous contracts according to their plain language and consistent with Tennessee legal precedent. Allowing parties to introduce parol testimony, for example, to vary fully integrated, legally unambiguous provisions would generate great uncertainty over the meaning of contracts executed under Tennessee law and would undermine the foundation of the parol evidence rule and the business court. Although the pending matter

preceded the creation of the business court, it was tried in the same Davidson County Chancery Court division.

In this case, the trial court erred when it considered parol evidence to interpret Article VI(B) of the 2009 Agreement to support its rejection of *Colonial Pipeline* as binding legal precedent that contractual indemnification and hold harmless provisions apply only to third-party claims.

In their joint brief the Nashville, Memphis and Chattanooga chambers of commerce state their reasons for filing an amici curiae brief, which are substantially similar to those of the Tennessee Chamber. Their brief reads in pertinent part:

Amici urge this Court to reverse the Chancery Court's unprecedented interpretation of Tennessee's parol evidence rule. Tennessee law enforces commercial contracts as written and prohibits parties from using parol testimony to vary unambiguous terms. Tennessee courts - particularly Tennessee's new Business Court - should adhere to existing Tennessee precedent adopting and applying this majority rule. The Chancery Court's reliance on the California Supreme Court's discredited minority view, which allows parties to use parol testimony to vary unambiguous terms, conflicts with existing Tennessee law and this Court should disavow it.

Enforcing unambiguous terms as written preserves commercial certainty and predictability, which are critical to Tennessee businesses in day-to-day operations and long-term planning. It also ensures that courts maintain their proper role in interpreting agreements rather than rewriting them. Tennessee's rule promotes judicial economy, which is especially important for Tennessee's already overburdened court system. It further ensures that contractual interpretation is based on the most reliable evidence - the parties' unambiguous written agreement - rather than hazy, self-serving, or even fraudulent testimony. The Chancery Court's approach in this case is especially problematic for the business community because the contracting parties included an integration clause in their agreement, signaling their desire to be bound only by the agreement's written terms.

Absent reversal, the Chancery Court's rule would have serious consequences for Tennessee businesses litigating contract disputes in Tennessee's Business Court and would adversely affect Tennessee's business environment. Under the Chancery Court's approach, no matter how clear a contractual provision is, either party could use parol testimony to attack its plain meaning and try to show that the parties really meant something else. This Court should reaffirm Tennessee's adoption and

- 28 -

application of the longstanding majority rule prohibiting parties from using parol testimony to vary unambiguous contractual provisions.

## B. THE TRIAL COURT'S RULINGS

In November 2012, IHS moved for partial summary judgment on its breach of contract claims. The trial court ruled that there were "*no ambiguities in the parties' contract documents*" and that the claims involved pure questions of contract interpretation, but IHS's interpretations of the contract did not prevail as a matter of law. (Emphasis added). Therefore, the motion was denied.

Thereafter, BlueCross filed a motion for partial summary judgment on IHS's claims. IHS responded to the motion by submitting extrinsic evidence to support its interpretation of the agreement that included declarations from former BlueCross employees as to the parties' intentions when entering into the 1999 agreement. In these declarations, the employees stated their general understanding that the 1999 agreement would require indemnification for attorney's fees in a contract dispute between IHS and BlueCross. In its ruling denying BlueCross's motion the trial court acknowledged that it had previously determined that the agency agreements were unambiguous, but held that it could still consider extrinsic evidence because the evidence "explain[s] the concerns and motivations surrounding the contract provisions." The court concluded that this parol evidence "create[d] a genuine issue of material fact on whether the parties mutually agreed and intended for the language used in the parties' agreement to express the terms now asserted by [IHS]."

Following a lengthy trial, the court entered a Memorandum and Order of Trial Findings of Fact and Conclusions of Law on September 3, 2015. In pertinent part, the court rejected IHS's claim for attorney's fees, holding that the indemnity provision does "not apply to a contract dispute between the contracting parties; it applies to third-party claims."

Thereafter, both parties filed motions to amend the order on various grounds. IHS asked the court to reconsider its holding that IHS was not entitled to attorney's fees under the indemnity provision. On December 22, 2015, the trial court granted IHS's motion with regard to the indemnity provision. The pertinent part of that order reads:

> The issue is that the Plaintiff contends that Article VI on its face applies to interparty breaches and allows the Plaintiff to recover the attorneys fees and costs it has incurred in this litigation. In addition there is extrinsic evidence of trial testimony of the Plaintiff and Defendant's agents that the parties intended for Article VI to provide interparty indemnity.

The Defendant asserts that Article only allows recovery for third-party claims and that interparty claims are not allowed under Article VI. The Defendant's position is that under Tennessee law standard indemnity provisions apply only to third-party claims.

In its Final Order the Court concluded it had precedent from the case of *Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616 (Tenn. Ct. App. 2007) to deny Plaintiff's indemnity claim.

From the briefing on the motions to alter or amend, the Court's impression of Tennessee law has changed. The Court's impression now, after the filing of the motions to alter or amend, is that Tennessee law is not clear as applied to the facts of this case. Other states' law, however, is clear and is helpful to start with.

In some states specific principles or standards apply to indemnification of attorneys fees in a suit between the contracting parties. For example, under New York law, there is a rebuttable presumption against a finding of indemnification of attorneys fees in a suit between the contracting parties. *In re Rqrco Securities Litigation*, 890 F. Supp. 2d 332, 341 (2012). Under New York law, "if the contracting parties could have anticipated that they would be subject to third-party claims, courts apply a presumption against concluding that their indemnification clause covers litigation costs incurred in the course of resolving claims between those contracting parties." *Id*. at 343.

Along the same lines is the Indiana case, cited by the Court in its Final Order. The lengthy quotation from *Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 966-67 (Ind. Ct. App. 2013) at pages 91-93 of the Final Order shows that under Indiana law there is a "general rule" that "an indemnity clause creates liability to pay only for third-party actions." *Id*. at 966-67. Thus, for interparty actions to be covered, the contract text must be clear and unequivocal that interparty claims are covered by the indemnify provision. *Id*.

In contrast, it appears that California law does not have a rebuttable presumption or general rule to carve out interparty indemnity claims unless a party is seeking indemnification for its own wrongdoing. (Citations omitted).

Prior to the briefing on the motions to alter or amend, this Court believed that Tennessee had a standard against indemnification of attorneys fees for interparty claims, similar to New York or Indiana, such that under

Tennessee law "standard indemnity, provisions apply only to third-party claims." BlueCross BlueShield of Tennessee Inc.'s Opposition to IHS's Motion to Alter or Amend, November 3, 2015, at 15. This belief was based upon the Defendant's analysis of *Colonial Pipeline Co. v. Nashville & R. R.R. Corp.*, 253 S.W.3d 616 (Tenn. Ct. App. 2007) which the Court adopted.

Now with the additional authorities and analysis provided at pages 11-13 of Plaintiff's Rule 59.04 Motion to Alter or Amend and Memorandum of Law in Support, October 5, 2015, in particular the unreported decision of *Linden v. Am. Storage Park*, 1990 WL 6836 (Tenn. Ct. App. Jan. 31, 1990), and that *Holcomb v. Cagle*, 277 S.W.3d 393 (2008) cites to *Linden*, the Court concludes that *Colonial Pipeline* does not establish a Tennessee standard regarding indemnity provisions. Instead it appears that the outcome in *Colonial Pipeline* was dictated by the facts. The Court so reasons because the further analysis in the recent briefing highlights that in *Colonial Pipeline* there was no evidence of the parties' intention about the meaning of the indemnity provision with respect to interparty claims, There is no particular guidance, then, in *Colonial Pipeline* for the case at bar.

As well, the Court did its best to survey Tennessee indemnity cases and could find in them no standard or rule like New York or Indiana that standard indemnity provisions apply to third-party claims. . . .

Additionally, as noted by the Plaintiff; if there is any standard or rule under Tennessee law regarding indemnity provisions not being construed to apply to interparty disputes, it is only the "absurd result" circumstance. Where this comes up in Tennessee law is if the indemnity provision refers to a duty of each party to assume and conduct the defense of the other. This duty to defend leads to an absurd result if the parties are suing each other. But, as noted in Plaintiff's briefing, in this case the Indemnity Provision contains no duty to defend and there is no absurd result if the Provision is applied to the interparty dispute in this case.

Under these circumstances of there being no standard in Tennessee that indemnity provisions apply to third-party claims and there being no absurd result in this case with interparty indemnity, the Plaintiff asserts the Court should apply generic Tennessee contract law, as the Court did with other issues in this case of application of the parties' contracts to the facts. In particular, the generic law is that "the situation of the parties and the accompanying circumstances at the time [the contract] was entered into-- not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement" may be

considered by the Court. *Hamblen City v. City of Morristown*, 656 S.W.2d 331, 333 (Tenn. 1983). With this "rule of practical construction," the interpretation placed upon a contract by the parties thereto . . , will be adopted by the court" *Id*. at 335. Under this law, the Court can take into account evidence of intent regarding indemnification of attorneys fees on interparty claims, and should make findings on intent and weigh the disputed testimony about intent. This, however, was not done in the Final Order.

Because the Court was under the misapprehension that *Colonial Pipeline* did establish a standard that in Tennessee indemnity provisions apply to third-party claims, the Court did not make detailed findings or weigh the evidence on the parties' intentions as to the meaning of the indemnity provision. That was erroneous. The Court therefore alters and amends its analysis, and makes findings and conclusions on the parties' intentions.

After making additional findings of fact based on the trial testimony of several witnesses, the trial court stated:

Lastly, the foregoing additional findings and weighing of the evidence are considered by the Court in conjunction with its findings on pages 24-25 of the Final Order that these motivations, policies and incentives were not just expressed by the Plaintiff and Defendant's agents in the start-up phase of the 1999 General Agency Agreement but were vital and agreed to in connection with the Plaintiff signing the 2009 General Agency Agreement.

Accordingly, based upon the additional legal authorities and analysis provided in the motions to alter and amend, the Court alters and amends the Final Order to grant the Plaintiff s claim for indemnity.

C. OUR ANALYSIS OF THE FOREGOING ISSUES

Having considered the briefs of the parties and the amici curiae; the trial court's reasoning; this court's decisions in *Linden v. American Storage Park* and *Colonial Pipeline*, on which the trial court placed particular reliance; our Supreme Court's reasoning in *Cracker Barrel Old Country Store, Inc. v. Epperson*; the Rule of Practical Construction as explained and applied in *Hamblen County v. City of Morristown*; and the American rule of attorney's fees, we conclude that the trial court erred by considering extrinsic evidence, and by going beyond the "four corners" of an integrated contract, to ascertain whether the right to recover attorney's fees under the indemnification provision applied to a dispute between the contracting parties.

We begin our analysis of this issue by noting that Tennessee adheres to the "American rule" for an award of attorney fees. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 284 S.W.3d 303, 308 (Tenn. 2009). Under the American rule, "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Id.* (citing *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). The rule, as applied in Tennessee, allows an exception only when the provision "specifically or expressly" provides for the recovery of attorney fees; otherwise, there is no right to recover attorney fees. *Id.* at 309.

In *Cracker Barrel*, our Supreme Court emphasized the significance of the requirement for *specific* or *express* language providing for attorney's fees.

> In the context of contract interpretation, *Tennessee allows an exception to the American rule only when a contract specifically or expressly provides for the recovery of attorney fees*. *Id*. ("The American rule provides that a party in a civil action may not recover attorney's fees absent a specific contractual or statutory provision providing for attorney's fees . . . .").

*Cracker Barrel Old Country Store, Inc.*, 284 S.W.3d at 309 (emphasis added).

Based upon the foregoing, we believe the issue here is straight forward, whether the Indemnification Provision expressly and specifically authorizes IHS to recover its attorney's fees *in the context of a dispute between the contracting parties*. We also believe the answer is straight forward; it does not.

> The indemnity provision at issue in the present case required BlueCross to, indemnify and hold [IHS] . . . harmless from any and all claims, lawsuits, settlements, judgments, costs, interest, and penalties, expenses and taxes, including but not limited to attorney's fees and court costs, resulting from or arising directly or indirectly out of or in connection[] with, any action or lack of action by [BlueCross] associated with this agreement.

In assessing whether this provision allowed for attorney's fees in a dispute between BlueCross and IHS, the trial court determined that Tennessee does not have a standard regarding indemnity provisions. In reaching this decision the trial court principally relied on this court's decisions in *Linden v. Am. Storage Park*, 1990 WL 6836 (Tenn. Ct. App. Jan. 31, 1990), *Holcomb v. Cagle*, 277 S.W.3d 393 (Tenn. Ct. App. 2008), and *Colonial Pipeline Co. v. Nashville & R.R. Corp.*, 253 S.W.3d 616 (Tenn. Ct. App. 2007).

In *Colonial Pipeline* we considered whether a standard indemnity provision applied to claims between the contracting parties in addition to claims involving third parties. The indemnity provision in *Colonial Pipeline*, which is substantially similar to that of BlueCross and IHS, required Colonial Pipeline to "indemnify and save harmless" the railroad "from and against all claims, suits, damage, cost-including attorney's fees, losses, and expenses, in any manner resulting from or arising out of the construction, maintenance, renewal, repair, use or existence of the pipeline." *Colonial Pipeline Co.*, 253 S.W.3d at 619.[7] The trial court granted summary judgment to Colonial Pipeline holding, as a matter of law, the indemnity provision "applied only to claims brought by third parties, not to disputes between the contracting parties." *Id*. at 620. The railroad appealed and we affirmed finding summary judgment appropriate because our courts have consistently held that standard indemnity provisions "*appl[y] only to suits brought by third parties*." *Id*. at 624 (emphasis added).[8] We relied, in part, on our reasoning in *Eatherly Const. Co. v. HTI Memorial Hospital*, wherein we held that an "indemnification provision only applies if and in the event a third party makes a claim." *Eatherly Const. Co. v. HTI Mem'l Hosp.*, No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *11 (Tenn. Ct. App. Sept. 12, 2005).

The indemnification provision in *Eatherly Construction* was substantially similar to the provision at issue here and in *Colonial Pipeline* with the exception that, under the provision in *Eatherly Construction*, Eatherly had the additional duty to defend Memorial Hospital.[9] In that case, Memorial Hospital claimed it was entitled to recover its attorney fees from Eatherly based upon paragraph 4.18.1 of the General Conditions of the Contract Documents. The trial court summarily dismissed Memorial's claim for attorney

---

[7] The railroad contended that paragraph ten of the agreement with Colonial Pipeline supported its counterclaim for attorney's fees and court costs. "That section required Colonial to 'indemnify and save harmless' [the railroad] 'from and against all claims, suits, damage, cost-including attorney's fees, losses, and expenses, in any manner resulting from or arising out of the construction, maintenance, renewal, repair, use or existence of the pipeline.'" *Colonial Pipeline Co.*, 253 S.W.3d at 619.

[8] Other states follow *Colonial Pipeline. See, e.g.*, *Nevadacare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 470-71 (Iowa 2010); *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 288-89 (Md. 2008); *Hooper Assocs., Ltd v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989); *Laurens Em. Med. Specialists, PA v. M.S. Bailey & Sons Bankers*, 584 S.E.2d 375, 378 (S.C. 2003); *Icehouse, Inc. v. Geissler*, 636 N.W.2d 459, 466-67 (S.D. 2001).

[9] The only substantive difference between the three indemnity provisions is that the provision in *Eatherly Construction* had the additional duty to defend; the duty to defend was not a requirement in the indemnification provisions in *Colonial Pipeline* or in the present case. The additional duty in *Eatherly Construction* read as follows: "The Contractor shall promptly advise the Owner . . . of any action . . . as to which this indemnification may apply, and the Contractor, at the Contractor's expense shall assume on behalf of the Owner (and the other Indemnities) and conduct with due diligence and in good faith the defense thereof. . . ." *Eatherly Const. Co.*, 2005 WL 2217078, at *10.

fees concluding that paragraph 4.18.1 was "merely an indemnification provision." *Id*. at *13. On appeal, we affirmed the trial court for the following reasons:

> *The Agreement expressly provides that the so-called attorney fee provision, as Memorial characterizes it, is an indemnification provision*. The first indication of this is the title of the relevant section, which is numbered "4.18." It is entitled, "INDEMNIFICATION." The text of section 4.18 reads in pertinent part:
>
>> 4.18.1 [T]he Contractor shall and does agree to indemnify, . . . and hold harmless the Owner, . . . from and against all claims, damages, losses, . . . causes of action, . . . and expenses (including attorney's fees) of any . . . description, directly or indirectly arising out of, caused by, or resulting from . . . : (1) breach of any of the Contractor's covenants, agreements, obligations or duties under the Contract Documents. . . . The Contractor shall promptly advise the Owner . . . of any action . . . as to which this indemnification may apply, and the Contractor, at the Contractor's expense shall assume on behalf of the Owner (and the other Indemnities) and conduct with due diligence and in good faith the defense thereof. . . .

*Id*. at *10 (emphasis added).[10]

As we explained, we found the parties' liberal use of the word "indemnification" significant because "[i]n construing contracts, the words expressing the parties' intentions should be given their usual, natural and ordinary meaning. . . ." *Id*. (citations omitted).

---

[10] The *Eatherly Construction* indemnification provision further stated:

4.l8.2 In respect to any and all claims against the Indemnitees ... the indemnification obligation under the Contract shall not be limited in any way by any limitation on the amount or type of damages....

4.18.4 The Contractor shall indemnify, defend and hold harmless the Owner from and against any claim, demand or cause of action arising . . . to which such claim, demand or cause of action relates.

4.18.5 It is agreed with respect to any legal limitations . . . affecting the validity or limiting the enforceability of the indemnification obligation under this Paragraph 4.18, such legal limitations are made apart of the indemnification obligation and shall operate as an amendment . . . ; and as so modified, the indemnification obligation shall continue in full force and effect.

*Eatherly Const. Co.*, 2005 WL 2217078, at *10-11.

Based upon our analysis, we concluded that the contract documents did not afford Memorial the right to recover its attorney fees. *Id*.

This brings us back to our decision in *Colonial Pipeline*, which BlueCross insists "forecloses IHS's attempt to recover its attorneys' fees and other litigation expenses in this case," because "[t]he standard indemnity provision at issue here is substantively identical to the one this Court considered in *Colonial Pipeline*." As BlueCross states in its brief,

> The Agreement provides that BCBST will "indemnify and hold [IHS] harmless from any and all claims, lawsuits, settlements, judgments, costs, interest, and penalties, expenses and taxes, including but not limited to attorney's fees and court costs resulting from, or arising directly or indirectly out of or in connection[] with, any action or lack of action by Company associated with this Agreement." As this Court held in *Colonial Pipeline*, such standard indemnity language unambiguously "applies only to suits brought by third parties." 253 S.W.3d at 624.
>
> *If the parties wanted to impose fee-shifting obligations in litigation between themselves, it was incumbent upon them to adopt a contractual provision clearly and unequivocally doing so*. This was particularly true at the time the parties negotiated and executed the Agreement, which occurred two years after this Court decided *Colonial Pipeline*. . . .

We find the foregoing argument of BlueCross persuasive, particularly the statement: "*If the parties wanted to impose fee-shifting obligations in litigation between themselves, it was incumbent upon them to adopt a contractual provision clearly and unequivocally doing so*." This is particularly significant because the only exception to the American rule in Tennessee is when the provision "specifically or expressly" provides for the recovery of attorney fees; otherwise, there is no right to recover attorney fees. *See Cracker Barrel Old Country Store, Inc*., 284 S.W.3d at 309.

Admittedly, the parties included fee shifting language in the context of indemnification; however, the provision did not specifically or expressly provide that the prevailing party in a dispute between them, the contracting parties, could recover its attorney's fees. Because the indemnity provision did not "specifically or expressly" state that the prevailing party in a contractual dispute between the contracting parties may recover its attorney's fees, IHS's reliance on the generic indemnification provision fails to satisfy the American rule as applied in Tennessee. *See Cracker Barrel Old County Store, Inc.*, 284 S.W.3d at 310 ("Tennessee allows an exception to the American rule only when a contract specifically or expressly provides for the recovery of attorney fees.").

As for the trial court's reliance on *Linden*, we find its reliance misplaced. Unlike the decision in *Colonial Pipeline*, *Linden* did not consider whether an indemnity provision applied to disputes between contracting parties; it only considered whether the indemnification provision in that case was "broad enough" to cover attorney's fees. *Linden*, 1990 WL 6836, at *5.[11] More importantly, the reasoning the trial court relied on is dictum because the *Linden* contract included a separate and straight-forward attorney fee provision that expressly afforded the prevailing party the right to recover attorney's fees. *Id.* at *2. That provision reads:

> 8. ATTORNEYS' FEES AND COST. In the event Lessor is required to obtain the service of an attorney to enforce any of the provisions of this Lease, Lessee agrees to pay in addition to the sums due hereunder, an additional amount as and for attorneys' fees and costs incurred.

*Id*. Because the *Linden* contract contained a straight-forward attorney's fee provision that specifically and expressly stated that the plaintiff agreed to pay attorney's fees and costs incurred by the defendant if it was required to obtain the service of an attorney to enforce any of the provisions of the lease, it was irrelevant whether the indemnification provision was "broad enough" to cover attorney's fees. Therefore, the reasoning the trial court relied on is dictum.[12]

We also note that the U.S. District Court of Middle Tennessee had refused to follow the reasoning in *Linden* in two cases. *See Bowen v. Paisley*, No. 3:13-CV-0414, 2014 WL 2708499, at *2-3 (M.D. Tenn. June 16, 2014); *see also Nat'l Healthcare Corp. v. Barker*, No. 3:14-cv-02015, 2016 WL 3232725 (M.D. Tenn. June 13, 2016). In *Bowen*, the District Court of Middle Tennessee reasoned,

> The defendants' counterargument relies on *Linden v. Am. Storage Park*, 1990 WL 6836, at *5 (Tenn. Ct. App. 1990), an unpublished decision in which the Tennessee Court of Appeals approved, without discussion of the "absurd result" identified in *Colonial Pipeline*, an award of attorney's fees to the indemnitee against claims by the indemnitor. To the extent that the

---

[11] The addendum in *Linden* included an indemnification provision that states, in pertinent part: "Tenant hereby agrees to indemnify and hold harmless the Lessor from and against any and all and any manner of claims for damages or loss to property or personal injury and costs including attorney's fees arising from tenant's use of the space or the facility. . . ." *Linden*, 1990 WL 6836, at *4.

[12] "Courts sometimes go beyond the point necessary for a decision in a lawsuit and make expressions on certain things there involved which are not necessary for a determination of the lawsuit. Such statements by a court are known as dictum." *Staten v. State*, 232 S.W.2d 18, 19 (Tenn. 1950). "Frequently and naturally dictum is persuasive, but, as a general rule it is not binding as an authority or a precedent within the rule of stare decisis." *Id.* (citing 21 C.J.S., Courts, § 190, page 309).

holding in *Linden* conflicts with the logic or holdings of *Colonial Pipeline* or *Holcomb*, the court relies, as it is obligated to do, upon the (subsequent) published decisions in *Colonial Pipeline* and *Holcomb*. *See* Tenn. Sup.Ct. R. 4(G); *Fortune v. Unum Life Ins. Co.*, 360 S.W.3d 390, 398 (Tenn. Ct. App. 2010).

*Bowen*, 2014 WL 2708499, at \*2. For these reasons, the District Court dismissed the defendants' claims for indemnification. *Id*. at \*3.

In the second case, *National Healthcare Corp. v. Barker*, yet another district court judge refused to follow *Linden*.[13] Applying the reasoning in *Colonial Pipeline*, the court held that a standard indemnity provision does not require contracting parties to reimburse one another for expenses incurred in litigation between the contracting parties. *Nat'l Healthcare Corp.*, 2016 WL 3232725, at \*13. The district noted, as we have in this opinion, that "contract provisions awarding attorney fees are strictly construed" and that any obligation to shift litigation expenses in a lawsuit between contracting parties must be "expressly and specifically set forth in the contract. *Id*. at \*11-12. For these reasons, the district court refused to follow *Linden*.

In its amicus curiae brief, the Tennessee Chamber of Commerce stated the following reason for preserving the usual and customary meaning that our courts have consistently attributed to indemnification clauses, which we find persuasive:

> The ability of lawyers and litigants to better predict and assess outcomes derives in large part from predictable judicial interpretation and enforcement of unambiguous contracts. In fact, it is critical to the success of Tennessee businesses. Precipitous changes in long-standing rules of contract interpretation, specifically the parol evidence rule, would have a detrimental impact on all contracting parties by creating uncertainty and increasing the likelihood of litigation.

Therefore, we conclude that the indemnification provision does not apply to disputes between the contracting parties, BlueCross and IHS; it only applies in the context of third party claims.

We now turn our attention to the Integration Provision. As BlueCross and the amici curiae note, it is significant that the parties included an integration provision, which expressly states that the Agreement constitutes "the entire Agreement between the parties" and "[a]ny prior agreements, promises, negotiations or representations, either

---

[13] *Bowen v. Paisley* was decided by District Court Judge Aleta Trauger. *National Healthcare Corp. v. Barker* was decided by District Court Judge Todd Campbell.

- 38 -

verbal or written relating to the subject matter of this agreement and not expressly set forth in this Agreement are of no force or effect." Under Tennessee law, when a written agreement is unambiguous on its face, and the agreement contains a clause stating that no other agreements exist other than the ones contained therein, it is final and cannot be varied by parol evidence. *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 863 (Tenn. Ct. App. 2000) (citing *Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d 373 (Tenn. Ct. App. 1992)). In two separate rulings on motions for partial summary judgment, the trial court stated that the agreement was unambiguous. Therefore, assuming the indemnity provision is unambiguous, and we believe it is, the court may not consider extrinsic evidence in ascertaining the parties' intention.

Under Tennessee's parol evidence rule, which is more conservative than the rule applied in *Pacific Gas*, a writing intended by the parties as the final expression of their agreement may not be contradicted by evidence of a prior or contemporaneous oral agreement, but may be explained or supplemented by consistent additional terms. *See* Tenn. Code Ann. § 47-2-202; *see also Next Generation, Inc.*, 49 S.W.3d at 863. Therefore, even if the parties had not included an integration provision, the trial court should not have considered extrinsic evidence in ascertaining the parties' intention about the meaning of the indemnity provision with respect to interparty claims.

Further, as with the trial court's decision regarding retroactive application of commission rates, we believe the trial court misapplied the rule of practical construction by considering what witnesses *thought* or *believed* the indemnification provision meant or was intended to mean when the agreement was being negotiated. The trial court stated that it could ascertain the intentions of the parties by considering "the situation of the parties and the accompanying circumstances at the time [the contract] was entered into–not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement." The trial court reached this conclusion based on the "rule of practical construction," and *Hamblen County v. City of Morristown*, 656 S.W.2d at 333. We agree that the rule allows the court to consider certain evidence regarding the situation of the parties; however, we believe the rule is more limiting than as applied in this case.

As discussed above, the rule of practical construction permits the court to consider *the situation* of the parties at the time of contracting as well as *the acts or conduct* of the parties to ascertain their intent; however, the rule does not permit testimony of what witnesses *thought* or *believed* it meant. Our understanding of the rule of practical construction is based on the Supreme Court's discussion of the rule and its application of the rule in *Hamblen County*, which reads in pertinent part:

> The rule of practical construction . . . , long recognized and applied in this jurisdiction, is that the interpretation placed upon a contract by the parties thereto, *as shown by their acts*, will be adopted by the court and that to this

end not only the acts but the declarations of the parties may be considered. *Womble v. Walker*, 181 Tenn. 246, 181 S.W.2d 5 (1944); *American Barge Line Co. v. Jones & Laughlin Steel Corporation*, 179 Tenn. 156, 163 S.W.2d 502 (1942); *Sherman v. Cate*, 159 Tenn. 69, 16 S.W.2d 25 (1929).

The rule is stated in Section 235 of the Restatement of Contracts as follows:

> "If the conduct of the parties subsequent to a manifestation of intention indicates that all of the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

Applying that rule, *it is apparent from the conduct of the parties* that they intended under the 1965 contract that the City of Morristown and its School Board should have the control and administration of these two high schools.

*Hamblen Cnty.*, 656 S.W.2d at 334-35 (emphasis added).

In its final ruling on the attorney fee issue, the trial court stated it applied "generic Tennessee contract law" and, in particular, the rule of practical construction to ascertain the interpretation placed upon the contract by the parties. Based upon its interpretation of the rule of practical construction, the trial court considered what five witnesses believed the parties' intended the indemnity provision to mean when the agreement was being negotiated. We believe this was error.

Admittedly, the rule of practical construction permits the courts to consider "the declarations of the parties"; however, the rule does not serve as a gateway for the consideration of parol evidence. Under the rule of practical construction, the declarations of the parties may be considered in the context of "the conduct of the parties subsequent to a manifestation of intention" to ascertain if the declarations indicate that all of the parties placed a particular interpretation upon it and if a reasonable person could attach that interpretation to the manifestation of intent. *Id.* at 335. However, the rule of practical construction is not a basis for considering what a witness believed the provision meant when the agreement was being negotiated. For these reason, we believe the trial court erred by considering the testimony of the five witnesses who stated what they believed the indemnification was intended to mean when the agreement was being negotiated.

Based on the foregoing analysis, we reverse the decision of the trial court and remand with instructions to deny IHS's claim for attorney's fees.

**IN CONCLUSION**

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed against the parties equally.

_____
FRANK G. CLEMENT, JR., P.J., M.S.